**Stacey B. LAWRENCE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–799.**

Court of Appeals of Alaska.

March 21, 1986.

Joseph A. Kalamarides, Kalamarides & MacMillan, Anchorage, for appellant.

William Ingaldson, Asst. Dist. Atty., Victor C. Krumm, Dist. Atty., Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and SINGLETON and ANDERSON,* JJ.

## OPINION

BRYNER, Chief Judge.

Stacey B. Lawrence appeals his conviction for driving while intoxicated, AS 28.-35.030. We affirm.

## I. FACTS

On December 4, 1983, Alaska State Trooper Barry Joe Croy stopped a car that was weaving and had its tail-lights out. The car was driven by Stacey Lawrence, an Anchorage Police Officer. When stopped, Lawrence was in uniform, driving home in his own car from a party.

When Croy noticed Lawrence's uniform, he asked for identification. Lawrence first showed his badge and then his driver's license. Croy asked Lawrence to come back to the trooper car. Although Lawrence said he had had two or three drinks and was returning home from a Christmas party, Croy saw nothing to indicate intoxication or impairment. Inside the trooper car, Croy asked Lawrence to recite the alphabet and to count downward from 200 to 180. Lawrence performed these tests accurately but slowly and deliberately.

Based upon these observations, Croy concluded that Lawrence was "borderline" concerning guilt for the offense of driving while intoxicated (DWI). Croy did not believe there was enough evidence of intoxication to make a "good, reliable DWI case that the district attorney's office [would] accept for prosecution." After talking with other troopers who had arrived at the scene, Croy decided to park Lawrence's car and take him home. He told Lawrence of his decision. Lawrence did not object. Croy later testified that he was not certain whether he told Lawrence he was not under arrest, but he assumed that Lawrence knew, simply because Croy was taking him home. Croy would have let Lawrence take a cab or arrange for another ride, but he would not have allowed him to drive.

On the way to Lawrence's home, Croy and Lawrence began to talk about the Intoximeter 3000. Lawrence is an experienced operator of the Intoximeter 3000. His duties have included instructing other officers in the operation of the device. Croy was curious about the accuracy of his conclusion that Lawrence was a "borderline" DWI violator, and, as they drove past the state trooper's Anchorage post, he asked if Lawrence would be willing to take the Intoximeter test. Croy clearly indicated that the test would be just for "kicks." He did not intend to arrest Lawrence, regardless of the results, and he did not anticipate that the results might be

* Anderson, District Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

used against Lawrence in any prosecution. Lawrence agreed to take the test. He said that he thought he would score a .18 or a .19.

Inside the station, Lawrence administered the test to himself. Croy was not concerned about who administered the test, because he was only seeking to satisfy his curiosity. The result obtained by Lawrence was .19. Lawrence did not preserve a sample of his own breath, and Croy did not fill out the usual forms. Despite the high Intoximeter score, Croy did not think he could arrest Lawrence, because he had not given Lawrence implied consent warnings and had not taken any of the other steps he would normally take in a routine DWI case. After the test, Croy drove Lawrence home as planned.

Croy was later contacted by the district attorney's office and questioned about his decision not to arrest Lawrence. Lawrence's Intoximeter result was retrieved through the machine's memory function, and he was eventually charged with DWI.

### PROCEEDINGS

Lawrence moved to suppress the Intoximeter result on several grounds. He argued that the state failed to establish a proper foundation for an admission of the Intoximeter result, that Croy had failed to read him the requisite implied consent warning, that Croy did not give him an opportunity to consult with an attorney before taking the test, that no sample of his breath had been preserved, and that Croy had improperly induced him to take the test by impliedly promising that no arrest would be made. After an evidentiary hearing, District Court Judge Natalie K. Finn denied all of Lawrence's motions, but ruled that "the state must still establish the reliability of the test before the result will be admitted at trial." Lawrence was later convicted by a jury.

### DISCUSSION

■ Lawrence first argues that he should have been allowed to consult with an attorney before deciding whether to take the breath test. *See Copelin v. State,* 659 P.2d 1206 (Alaska 1983), *cert. denied,*

— U.S. —, 105 S.Ct. 430, 83 L.Ed.2d 357 (1984). Under *Copelin,* however, the right to consult with counsel arises only when a person is arrested for DWI and asks to contact an attorney. *Id.* at 1208. Lawrence was not arrested for DWI, and he made no such request. Lawrence had no independent constitutional right to contact counsel prior to deciding whether to take an Intoximeter test. *Svedlund v. Anchorage,* 671 P.2d 378, 381 (Alaska App.1983).

■ Lawrence next argues that Croy did not comply with AS 28.35.031(a), which authorizes a breath test only when there is probable cause to believe that a person has been driving while intoxicated. *See Burnett v. Anchorage,* 678 P.2d 1364, 1368 (Alaska App.), *cert. denied,* — U.S. —, 105 S.Ct. 190, 83 L.Ed.2d 123 (1984). The statute, however, does not apply in this situation. Lawrence freely consented to take the test and even administered it himself. He was in no way coerced to take the test. Reliance on the implied consent statute was unnecessary in Lawrence's case, because Lawrence gave his actual consent to the test. Alaska Statute 28.35.031 does not preclude administering an Intoximeter test under these circumstances.

■ Lawrence next argues that the state failed to preserve a sample of his breath. *See Anchorage v. Serrano,* 649 P.2d 256 (Alaska App.1982). Even assuming that *Serrano* applies to breath tests consented to by a person who has not been arrested for DWI, the state is not held strictly liable whenever there is no preserved sample. *Anchorage v. Flack,* 685 P.2d 108, 109 (Alaska App.1984). The machine used by Lawrence was equipped to preserve a sample automatically; Lawrence simply turned off the machine before the sample was preserved. Under these circumstances, the failure to preserve a breath sample cannot be attributed to the state, and suppression is unwarranted. *Id.* at 110.

Lawrence also argues that his statements to Croy should have been suppressed because they resulted from an implied promise that no arrest would be made: "[Croy's] actions in not arresting

Lawrence and offering to give him a ride home communicated to Lawrence that there was going to be no criminal action against him." This argument cannot apply to statements Lawrence made before Croy decided to drive Lawrence home. As to subsequent statements, Judge Finn concluded that they were made in the course of a casual conversation and were not the product of an interrogation. Judge Finn also found that driving Lawrence home was not a ploy on Croy's part and that Croy never intended to arrest Lawrence. It would be difficult to refute this conclusion, since Croy in fact did not arrest Lawrence, even after the relatively high Intoximeter result.

■ Judge Finn did not expressly make a finding as to whether there was any promise, implied or express. However, we find no evidence of any promise that was not fulfilled. Croy assumed that Lawrence knew he was not being arrested, and it seems fairly obvious that Lawrence did in fact know that he was not under arrest. It does not appear that Croy told Lawrence that no charges could ever result from the incident. Croy never represented that Lawrence had anything to gain by making any statements, and there is nothing to indicate that Lawrence believed he stood to gain anything from the statements he made. Nor do we find any basis for concluding that Lawrence—particularly as an experienced law enforcement officer—could reasonably have believed that Croy had the legal authority to make a binding commitment precluding the state from any future effort to prosecute Lawrence. At most, Croy's conduct and statements amounted to an implied promise to refrain personally from making an arrest and to refrain from taking any further action against Lawrence. Yet, to the extent that Croy impliedly made such a promise, he clearly kept it.

Lawrence relies on *S.B. v. State*, 614 P.2d 786 (Alaska 1980), in which the supreme court held that there was no need to suppress statements made by a juvenile in response to a police officer's promise that he would recommend leniency if the juvenile told the truth. The court suggested that suppression might be warranted "[h]ad the officer indicated that no charges would be filed in exchange for the young man's candor...." *Id.* at 789. In this case, however, there is simply no element of exchange, or *quid pro quo*. Even if Lawrence made the statements under the mistaken apprehension that no charges would be filed in this case, Croy did not induce or encourage Lawrence to make the statements. We find no error in admission of the statements. We similarly conclude that Lawrence's consent to take the Intoximeter test was not the product of any unkept promise, express or implied.

Lawrence's final contention is that the Intoximeter result should have been suppressed "for failure to meet foundational requirements." At the evidentiary hearing on the motion, Croy testified that he did not observe Lawrence as closely as he would a DWI arrestee but that he did not see him do anything that would have adversely affected the accuracy of the breath test. Once inside the trooper post, Lawrence turned on the light and put a new mouthpiece on the Intoximeter machine. Croy watched as Lawrence pushed the "start" button and then pushed "enter". When the computer portion of the Intoximeter 3000 asked for a breath sample, Lawrence provided a breath sample. Once the result of .19 was displayed on the screen, Lawrence turned the machine off. Lawrence ran an initial external standard, but did not run a second external standard after the result was displayed. Croy nonetheless testified that he had no doubts about the reliability of the test run by Lawrence. Croy had himself administered about 250 Intoximeter tests, and he had never encountered a situation in which the external standard was acceptable on the first reading, before the breath sample was provided, but unacceptable on the second reading, after the sample was provided and analyzed.

Sergeant Stewart, another trooper who served as an Intoximeter instructor, testified that over a two-year period he had never heard of the first external standard result not matching the second. However, Officer Turner Pippin of the Anchorage

Police Department, also an instructor on the Intoximeter 3000 and a factory-trained repair technician, stated that he could not testify as to the accuracy or reliability of any test run without the second external standard.

In his motion to suppress, Lawrence pointed out that, in administering the test to himself, he had not complied with many of the procedures approved by the Department of Health and Social Services for use of the Intoximeter 3000 machine. 7 AAC 30.020. In arguing the motion, Lawrence's attorney focused in particular upon the fact that no second external standard was done. The assistant district attorney emphasized the testimony of Croy and Stewart and pointed out that there was no suggestion that there were odors present in the room that might have affected the test. Because the main function of the second standard is to determine whether any external influences could be operating, the fact that the second standard was not run did not really affect the reliability of the result itself, according to the state.

At the conclusion of the pretrial hearing, Judge Finn expressed some reservations about the reliability of the manner in which Lawrence administered his test. The judge nevertheless declined to suppress the test result in advance of trial, ruling, instead, that "the state must still establish the reliability of the test before the result will be admitted at trial."

■ On appeal, Lawrence renews the argument that the specified procedures for administering an Intoximeter test were not complied with. Significantly, however, his claim is restricted to the adequacy of the state's pretrial evidence. He does not argue that the foundation established at trial was inadequate, nor does he assert that his jury was instructed in accordance with any of the statutory presumptions regarding breath test results. Because Lawrence has not made any assertions to the contrary, we must assume that an adequate foundation was presented at trial for the introduction of the Intoximeter test result and that the jury was not instructed in accordance

with any of the presumptions. It is therefore irrelevant whether the evidence presented in the pretrial hearing was sufficient to establish substantial compliance with the procedures prescribed by the department. *See Oveson v. Anchorage,* 574 P.2d 801 (Alaska 1978); *Wester v. State,* 528 P.2d 1179, 1184 (Alaska 1974), *cert. denied,* 423 U.S. 836, 96 S.Ct. 60, 46 L.Ed.2d 54 (1975). Even in the absence of strict compliance with the specified procedures for administering breath tests, AS 28.35.031 did not preclude the state from seeking admission of Lawrence's Intoximeter test result by laying a proper foundation independently establishing the accuracy of that result. *Ahsogaek v. State,* 652 P.2d 505, 506 (Alaska App.1982). As Judge Finn stated at the close of the evidentiary hearing, nothing precluded Lawrence from attacking the Intoximeter result by pointing out to the jury any weaknesses in the foundation or in the administration of the test. *See Pears v. State,* 672 P.2d 903, 909 (Alaska App.1983), *reversed on other grounds,* 698 P.2d 1198 (Alaska 1985); *Cooley v. Anchorage,* 649 P.2d 251, 254–55 (Alaska App.1982).

■ Lawrence nonetheless argues that placing him in the position of having to attack the administration of the test conflicted with his fifth amendment right against self-incrimination. In particular, Lawrence notes that, in order to suggest that he was too intoxicated to administer a reliable test, he would have had to present evidence that tended simultaneously to establish an element of the offense with which he was charged. While Lawrence is correct that admission of the test result required him to make a difficult choice, we find no basis for concluding that putting him to such a choice was constitutionally prohibited.

The conviction is AFFIRMED.

COATS, J., not participating.