STATE OF HAWAII, Plaintiff-Appellee, *v.* JOHN FREDERICK SOUZA, Defendant-Appellant

NO. 11285

(D.C.NO. 84-7096)

JANUARY 29, 1987

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

This is an appeal by defendant John Frederick Souza (Souza) of his conviction for the offense of driving under the influence of intoxicating

liquor (DUI) in violation of Hawaii Revised Statutes (HRS) § 291-4(a)(2) (1985).[1] The appeal requires our determination of the sufficiency of the foundation required in order to have the result of a breath testing instrument admitted into evidence. We hold that if the evidence indicates a lack of strict compliance with those provisions of the Department of Health regulations which have a direct impact on the validity and accuracy of the test result, the foundational requirements have not been met and the result is inadmissible. However, since our review of the record in this case discloses that the State met the foundational requirements, we affirm.

I.

On October 11, 1984, Souza was arrested for a DUI offense. At the police station Souza consented to a breath test. The test administered on an Intoxilyzer Model 4011AS (Intoxilyzer)[2] resulted in a blood alcohol content reading of 0.13 percent.

---

[1]Hawaii Revised Statutes § 291-4(a)(2) (1985) states:
   (a) A person commits the offense of driving under the influence of intoxicating liquor if:

* * *

   (2) The person operates or assumes actual physical control of the operation of any vehicle with 0.10 per cent or more, by weight of alcohol in the person's blood.

[2]The Intoxilyzer Model 4011AS is a breath testing instrument used to determine a person's blood alcohol concentration. In *People v. Drumm,* 122 Misc. 2d 1051, 1055-56, 472 N.Y.S.2d 989, 992-93 (1984), the court described the Intoxilyzer Model 4011AS as follows:
   This instrument utilizes infrared energy, and is based upon the Beer-Lambert Law of absorption . . . . Simply stated, ethyl alcohol absorbs infrared energy at a wavelength of about 3.39 microns, and the intoxilyzer contains an absorption band, from an infrared energy light source, within this range. Other substances, specifically including acetone, may absorb infrared energy at the same wavelength, and, therefore, unlike the earlier models of the intoxilyzer, as well as the intoximeter 3000, Model 4011AS contains a second absorption band, at 4.48 microns, at which alcohol, but not these other substances will absorb the infrared energy. Thus, the presence of ethyl alcohol, contained in the breath sample, can be detected, and, furthermore, the alcohol vapor, contained in the sample cell, will absorb the infrared energy in proportion to its concentration. As the concentration of alcohol increases, the amount of infrared energy reaching the detector will proportionately decrease. The result is converted to a blood alcohol content reading, which is displayed, and also printed on a card, which has previously been inserted into the instrument.

At the bench trial, police matron Nellie Yaw testified that she was certified as an Intoxilyzer operator in December 1983, she conducted the breath test on Souza on October 11, 1984, and in conducting the test she followed a checklist based on the manufacturer's recommendation and the Department of Health regulation.

Criminalist Milton Chang (Chang) who was a certified Intoxilyzer operator-supervisor also testified. He stated that he tested the accuracy of the Intoxilyzer used on Souza on October 5, 1984 and October 12, 1984. The testing process described by Chang initially involved the preparation of a stock solution by Chang or another criminalist in the crime laboratory by diluting 77 milliliters of "absolute alcohol . . . in a [sic] 1,000 milliliters of water." February 24, 1986 Transcript at 10. Though apparently no record was made detailing the composition of the stock solution, Chang testified that this was the standard procedure even "prior to the use of the intoxilyzer."[3] *Id.* Next, "in accordance with the recommendations of the manufacturer," Chang prepared two solutions by further diluting 10 milliliters and 20 milliliters of stock solutions separately "with water to 500 milliliters in a volumetric flask." *Id.* at 7, 9. According to Chang, the dilution of 10 and 20 milliliters of stock solution resulted in .10 percent and .20 percent simulator solutions, respectively. There was no independent analysis of the simulator solutions for their alcoholic content. The simulator solutions were then stored in sealed jars which include heating units that maintain a certain temperature "simulat[ing] the mouth temperature of an individual." *Id.* at 16. Apparently, the heating units are also equipped with thermometers.

Using the .10 percent and .20 percent simulator solutions, which according to Chang had not been used more than five times previously, Chang tested the Intoxilyzer on October 5, 1984, and found it "to be operating properly and accurately." February 11, 1986 Transcript at 47. A subsequent test on October 12, 1984 revealed the same result.

Based on the Intoxilyzer test result, the district court found Souza guilty of the DUI offense.

---

[3]Prior to the use of the Intoxilyzer, the Breathalyzer breath testing instrument was used.

## II.

"[T]he basic proscription of drunk driving" and "'certain [evidentiary] presumptions [relating to a person's intoxicated state] based upon the amount of alcohol in a person's blood[,]'" have been a part of Hawaii statutes since 1949.[4] *State v. Tengan,* 67 Haw. 451, 455, 691 P.2d 365, 369 (1984). These proscription and presumptions were reinforced in 1967 by the "implied consent" law[5] which is a "'method of compelling a person arrested for drunken driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit to a test for intoxication.'" *Rossell v. City & County,* 59 Haw. 173, 181, 579 P.2d 663, 669 (1978) (quoting *People v. Superior Court,* 6 Cal. 3d 757, 765, 493 P.2d 1145, 1150, 100 Cal. Rptr. 281, 286 (1972)).

In 1973, by the enactment of Act 139, the legislature "designate[d] the Department of Health as the statewide administrator for the scientific and technical control of chemical testing for blood alcohol." Sen. Stand. Comm. Rep. No. 692, in 1973 Senate Journal at 924. HRS § 321-161 (1985), which codifies Act 139, states:

> Chemical testing for blood-alcohol concentration. (a) The department of health shall establish and administer a statewide program relating to chemical testing of blood-alcohol concentrations for the purposes of chapter 286, part VII, and chapters 291 and 291C, with the consultation of the state director of transportation. Under the program, appropriate procedures shall be established for specifying:
>
> (1) The qualifications of personnel who administer chemical tests used to determine blood-alcohol concentrations;
>
> (2) The procedures for specimen selection, collection, handling, and analysis; and
>
> (3) The manner of reporting and tabulation of the results.
>
> (b) The director of health may adopt rules and regulations pursuant to chapter 91 necessary for the purposes of this section.

---

[4]*See* Act 283, § 1, 1949 Haw. Sess. Laws 602, presently, HRS §§ 291-4 and 291-5 (1985).

[5]*See* Act 214, § 2, 1967 Haw. Sess. Laws 257, 270-72. The implied consent law is codified in HRS Chapter 286, Part VII (§§ 286-151 through 286-163).

As authorized by HRS § 321-161(b), the Director of Health has adopted rules and regulations regarding the "Testing of Blood, Breath and Other Bodily Substances of Alcohol Concentration" which are compiled in Chapter 111 of Title 11 of the State's Administrative Rules (Rules).[6]

### III.

In *State v. Nakahara,* 5 Haw. App. 575, 704 P.2d 927 (1985), where the evidence clearly indicated that the operator of the Intoxilyzer had less than eight hours of instruction and training and had not been issued an operator's permit by the chief of police contrary to the requirements of §§ 11-111-4(1)(A) and 11-111-8(b) of the Rules, we stated that "unless there has been strict compliance with Chapter 111 of the Rules, the State may not use the Intoxilyzer test result as proof of a defendant's violation of HRS § 291-4." *Id.* 5 Haw. App. at 578, 704 P.2d at 929.

Citing *Nakahara,* Souza contends that "failure to comply with Section 11-111-2(b) of Chapter 111, Administrative Rules of the Department of Health rendered the test result obtained by use of the Intoxilyzer inadmissable [sic]." Based on our refinement of *Nakahara,* as set forth below, we hold that the State complied with § 11-111-2(b) of the Rules.

### A.

A fundamental rule of evidence is that before the result of a test made out of court may be introduced into evidence, a foundation must be laid showing that the test result can be relied on as a substantive fact. *See* 29 Am. Jur. 2d *Evidence* § 823 (1967). Regarding the Intoxilyzer, its use "had been approved by the Director of Health and it met the Federal Standard for Devices to Measure Breath Alcohol[,]" thus attesting to its reliability as a breath testing instrument. *Tengan,* 67 Haw. at 462, 691 P.2d at 373. However, for the admission of the test result from the use of a particular Intoxilyzer utilized at a specific time, there must be sufficient foundational evidence showing that (1) the Intoxilyzer was in proper working order; (2) its operator was qualified; and (3) the test was properly administered. *See People v. Adams,* 59 Cal. App. 3d 559, 131

---

[6]Chapter 111 of Title 11 of the State's Administrative Rules (Rules) is based substantially on the former Chapter 47 of the Public Health Regulations.

Cal. Rptr. 190 (1976); *People v. Bowers,* 716 P.2d 471 (Colo. 1986); 2 S. Gard, *Jones on Evidence* § 14.37 (6th ed. 1972).

The issue raised on appeal involves the sufficiency of the foundational evidence required. Souza argues that unless there is a showing of strict compliance with the Rules' provisions relating to the Intoxilyzer, the foundational requirements have not been met. On the other hand, the State contends that because there is no statute expressly conditioning the admission of test results on compliance with the Rules, the test result should be admissible upon a showing of "substantial" compliance with the Rules.

Based on our perception of the legislative intent underlying HRS § 321-161, we hold that in meeting the foundational prerequisites for the admission of the Intoxilyzer test result there must be a showing of strict compliance with those provisions of the Rules which have a direct bearing on the validity and accuracy of the test result.[7]

We are mindful of decisions holding that where the legislation provides that "tests shall be made in accordance with the regulations but not expressly conditioning validity or admissibility of the test results thereon[,]" "noncompliance goes merely to the weight of the evidence[,]" not to admissibility. *People v. Adams,* 59 Cal. App. 3d at 564, 567, 131 Cal. Rptr. at 193, 195. *See Lawrence v. State,* 715 P.2d 1213 (Alaska App. 1986); *People v. Bowers, supra.* Otherwise, "there would be the incentive to turn the drunk driving case into a contest to find a technical defect in the test procedure so as to have the evidence excluded." *People v. Adams,* 59 Cal. App. 3d at 567, 131 Cal. Rptr. at 195. However, we are not persuaded by those decisions.

By HRS § 291-4(a)(2) the legislature has created a *per se* DUI offense —proof of 0.10 percent or more by weight of alcohol in a driver's blood being sufficient for conviction. Under HRS § 291-5(b) certain presumptions arise based on the test result. Therefore, we stated in *Nakahara* that it is "of utmost importance that the testing to determine the blood alcohol concentration from a person's blood or breath be accurate." *Id.* 5 Haw. App. at 578, 704 P.2d at 929.

---

[7]In *State v. Liuafi,* 1 Haw. App. 625, 623 P.2d 1271 (1981), a case involving attempted murder and failure to render assistance, this court held that no showing of compliance with the Rules was required to admit the breathalyzer test results into evidence because HRS § 321-161 applied only to proceedings under HRS Chapters 286, Part VII (implied consent statutes), 291 (traffic violations), and 291C (statewide traffic code).

We agree with the State that neither HRS § 321-161 nor other statutes expressly provide that noncompliance with the Rules will render test results invalid or inadmissible as evidence. However, in enacting HRS § 321-161, the legislature designated "the Department of Health as the statewide administrator for the scientific and technical control of chemical testing for blood alcohol[,]" since "no such controls are prevalent with regard to chemical testing for blood alcohol." Sen. Stand. Comm. Rep. No. 692, in 1973 Senate Journal, at 924. The legislation also authorizes the Director of Health to adopt rules and regulations for the purpose of HRS § 321-161, which the Director has done. Clearly, the legislative goal was uniformity in test procedures for blood alcohol concentrations. Without compliance with the Rules, there can be no uniformity. *See Fuenning v. Superior Court,* 139 Ariz. 590, 680 P.2d 121 (1983).

In addition to uniformity, the legislation sought the promulgation of rules and regulations assuring proper "scientific and technical" procedures in the testing for blood alcohol concentration by the State's expert, the Department of Health. It would be incongruous for us to hold that the State need not comply with those rules and regulations where the admission of the test result is at issue. We do not deem it unreasonable to exact compliance with the laws and rules and regulations promulgated thereunder from those who enforce those laws.

### B.

Souza challenges the admission of the test result on the ground of insufficiency of the foundational evidence to show that the Intoxilyzer was in proper working order. More particularly, he claims noncompliance with § 11-111-2(b) of the Rules pertaining to breath testing instruments which provides as follows:

(b) Testing for accuracy, maintenance and repair of all breath testing instruments and related accessories employed pursuant to this chapter shall comply with the following:

(1) It shall be the responsibility of the operator/supervisor to assure that testing for accuracy is done.

(2) Only methods recommended by the manufacturers or approved by the department for the testing for accuracy shall be employed.

(3) Testing for accuracy shall be done no less frequently than

 

every thirty (30) days and after every maintenance and repair using a minimum of two (2) reference samples of known alcohol concentrations at a known temperature within the range of one hundredths to thirty hundredths percent weight per volume (0.01% to 0.30% W/V) or higher known alcohol concentrations that are recommended by the breath testing instrument's manufacturer. The results of such analysis must agree with the reference sample value within the limits of plus or minus one hundredths percent weight per volume (±0.01% W/V) or such limits set by the director.

(4) Maintenance and repair of instruments shall be at the expense of the agency using the instrument.

(5) Results of tests for accuracy, maintenance and repair shall be noted in a permanent record book as required in § 11-111-6(2).

(6) It shall be the responsibility of the operator/supervisor to keep as a permanent record assay reports that certifies [sic] the amount and composition of the chemicals in the lot of reference sample of alcohol solutions, ampoules, lens or air.

1.

We construe Souza's initial challenge as stating that Chang's testing of the Intoxilyzer's accuracy was done without using "two (2) reference samples of known alcohol concentrations" contrary to § 11-111-2(b)(3).[8] The thrust of his argument is that *known* alcohol concentrations were not used since Chang "made no analysis to determine the alcohol concentration" of the alleged .10 percent and .20 percent simulator solutions before using them to test the Intoxilyzer. We disagree.

While independent analysis may serve to further verify the alcohol concentration of the simulator solutions, the Rules do not require such analysis. Also, Chang testified that independent analysis is "not recom-

---

[8]Souza also contends noncompliance with that part of § 11-111-2(b)(3) of the Rules which requires testing "no less frequently than every thirty (30) days." This contention is frivolous. There was testimony that the Intoxilyzer in question was tested for accuracy on October 5, 1984, and again on October 12, 1984, the day after Souza was tested. This clearly evidences compliance.

mended by the manufacturer[.]" February 24, 1986 Transcript at 16.

Moreover, Chang's testimony indicates that the simulator solutions were prepared by diluting known quantities of stock solution with known quantities of water resulting in simulator solutions with known values of alcoholic content. *See Hughes v. State,* 17 Ark. App. 34, 702 S.W.2d 817, *supplemented by* 17 Ark. App. 34, 705 S.W.2d 455 (1986).

We therefore conclude that Chang used "a minimum of two (2) reference samples of known alcohol concentrations" in testing the Intoxilyzer for accuracy, strictly complying with § 11-111-2(b)(3) of the Rules.

2.

Souza's next challenge is directed to § 11-111-2(b)(6) of the Rules which requires "the operator/supervisor to keep as a permanent record assay reports that certifies [sic] the amount and composition of the chemicals in the lot of reference sample of alcohol solutions[.]" Claiming lack of strict compliance because Chang failed to "keep any record of [the] composition and amount [of the stock and simulator solutions] in any permanent book[,]" Souza argues the Intoxilyzer test result was inadmissible. We are not persuaded by this technical argument because § 11-111-2(b)(6) has no direct bearing on the validity or accuracy of the test result.

As stated above our prime concern is with the validity and accuracy of the test result. Therefore, where the Rules' provisions have a direct bearing in that regard we require strict compliance with those provisions to fulfill the foundational prerequisites of admissibility. Our decision in *Nakahara, supra,* indicates that the qualification of the Intoxilyzer operator has a direct bearing on the accuracy of the test result. However, where the provision in question has no direct impact on the validity or accuracy of the test result, honcompliance will not result in inadmissibility but will·go to the weight of the State's evidence.

The procedure specified in § 11-111-2(b)(3) in testing for accuracy of the Intoxilyzer clearly has a direct bearing on the test result obtained from that Intoxilyzer. In our view, however, the fact that Chang failed to keep a record concerning the stock and simulator solutions has no direct impact on the validity and accuracy of the test result. Consequently, such record keeping deficiencies affect the weight to be given to the test result but do not affect its admissibility.

Affirmed.

*Kazuo Oyama* for defendant-appellant.

*Candace Kay Andersen,* Deputy Prosecuting Attorney, for plaintiff-appellee.