681 So.2d 1157 (1996)
STATE of Florida, Appellant,
v.
Cynthia A. FRIEDRICH, et al., Appellees.
Nos. 95-775, 95-777, 95-923, 95-926, 95-1202 and 95-1204.
District Court of Appeal of Florida, Fifth District.
September 12, 1996.
Rehearing Denied October 31, 1996.
*1159 Robert A. Butterworth, Attorney General, Tallahassee, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Appellant.
Ernest J. Mullins, Kissimmee, for Appellees.
W. SHARP, Judge.
We consolidated for purposes of appellate review[1] six cases in which two Osceola county court judges[2] granted the respective defendants' motions in limine to exclude evidence of breath test results in the defendants' prosecutions by the state for driving under the influence.[3] In all of these six cases, the trial courts relied on an identical record. It consists of testimony presented by expert witnesses and the FDLE technicians who test and maintain the Intoxilyzer machines, which produced the breath test results proffered by the state in these six cases. The trial courts also certified two questions to this court as involving matters of great public importance. The state appealed and we accepted jurisdiction.[4]
The basis for the trial courts' rulings on the motions in limine are stated in the content of the certified questions:
A. WHETHER THE STATE OF FLORIDA SHOULD BE PROHIBITED FROM INTRODUCING BREATH TEST RESULTS IN DUI PROSECUTIONS WHERE LOCAL LAW ENFORCEMENT TESTS THEIR BREATH TESTING EQUIPMENT USING FDLE CERTIFIED STOCK SOLUTIONS WHICH HAVE NOT BEEN TESTED FOR SHELF-LIFE INTEGRITY AND WHERE THE QUANTITIES OF ALCOHOL *1160 CONTAINED IN THE SOLUTION IS NOT NECESSARILY KNOWN?
B. WHETHER THE STATE OF FLORIDA SHOULD BE PROHIBITED FROM INTRODUCING BREATH TEST RESULTS IN DUI PROSECUTIONS WHERE THE INITIAL ALCOHOL SAMPLES FURNISHED BY FDLE WERE PREPARED WITH CONCENTRATIONS OF ALCOHOL WHICH WERE ONLY WITHIN A "RANGE" OF CONCENTRATIONS THAT MAY RESULT IN THE ACCURACY (AS OPPOSED TO PRECISION) OF THE INSTRUMENT BEING UNRELIABLE?
As limited and framed by the record in these cases, we answer both questions generally "no" and reverse. However, we recognize that the problems raised in Question B may provide a defense to a breath test placed in evidence, in a particular case, for a limited number of defendants.
The defendants in these consolidated cases sought to prevent the admission in evidence of their breath tests because they were scientifically unreliable, and because the state failed to establish compliance with the rules and regulations established by the Florida Department of Law Enforcement (FDLE) and the Florida Administrative Code.[5] Rules 11D-8.001 through 8.006 govern how the breath testing machines (the Intoxilyzer 5000) must be maintained and tested for accuracy in order to make breath test results admissible in evidence in a DUI case.[6] Both certified questions raise potential problems with the chemical composition of the stock solutions, which are used to test the accuracy and precision of the Intoxilyzer machines, initially when they are first put into service,[7] and thereafter on an annual[8] and monthly basis.[9]
The defendants' first ground of attack was to show that the stock solution is a volatile liquid composed of water and ethyl alcohol (ethanol). The relative composition of the solution may change over time because water and ethanol evaporate at different rates. Thus, its exact chemical composition cannot be guaranteed, unless a shelf-life time is established and unless the bottles containing the testing solution are date labeled. The defendants' second ground of attack was to show that the stock solution (which is prepared to test all the Intoxilyzer machines used in Florida, in the FDLE laboratory by the state's chemist, Thomas Wood) is sent out for use in the field, without a label showing the exact quantities of water and ethanol in each batch of stock solution. Wood testified that the ratio of ethanol to water in the batches may vary within a range of .116 to.126, although his "target" is .1215. That possible range or variation, when added to the legally permitted range of plus or minus.005 accuracy for the Intoxilyzer machines[10] can theoretically cause a machine to give a false reading outside of the acceptable range for accuracy. Both points will be discussed below.

I. Failure to Establish a Shelf-Life for the Stock Solution and Failure to Label the Test Bottles Containing Stock Solution as to Date of Preparation.
Both expert witnesses, Thomas Wood, senior chemical analyst for FDLE, who testified for the state, and Wayne Morris, a chemist employed by Morris-Kopec Forensics, Inc., who testified for the defense, described the stock solution as volatile. Since ethanol evaporates more rapidly than water, time may cause the relative composition of the solution (ratio of ethanol to water) to change. The outside time limit for the integrity of the stock solution, or its shelf life, has not been scientifically established. Wood testified he makes up a small batch of the stock solution at one time and places it in three ounce bottles. The bottles are then sealed, samples *1161 tested, and the balance of the batch is sent to the field for use.
Trained personnel in the field prepare a simulator solution from the stock solution in order to test the Intoxilyzer machines. The simulator solution is produced in the field by simply adding a certain amount of water to the stock solution, in order to mimic a human being's breath vapor at the required levels of testing.050, .100, and .200. An Intoxilyzer machine's accuracy or precision is then determined by how close the machine gauges the expected result. Obviously the accuracy and reliability of the tests depend on the accurate chemical composition of the stock solution, from which is derived the simulator solution.
Wood testified that in the experience of FDLE and his laboratory, there is no evidence that the integrity of the chemical composition of the stock solution has failed due to the passage of time. Had there been such problems, he would have been alerted by machines all over the state testing out of the expected range. This has not happened. Further, he testified that in Florida the bottles of stock solution are normally used up in the field long before there could be shelf-life problems. He said he would comfortably place a shelf life of one year on the stock solution but he was confident it would last much longer than that. He said typically one bottle of stock solution only lasts for two inspections of a machine, and at that rate, a bottle is used up within two months.
Lieutenant Wright, who does the monthly inspections of the two Intoxilyzer machines which produced the test results in these DUI cases, testified that the records on the two machines demonstrate their accuracy. These records were placed in evidence. He pointed out that the tests on the machines, over a 40-month period, show little or no variation in results, although different bottles of stock solution were used over that period of time. He testified that these two machines have consistently tested within the tolerance levels prescribed by FDLE over the 14-month period preceding the breath tests involved in these cases.
Grady Wright, another technician who is also responsible for testing the accuracy of the two Intoxilyzer machines, testified that over a period of a year and a half, he received and used up six bottles of stock solution. He also testified that just prior to the tests involved in these cases, a FDLE inspector ran the required monthly series of tests, with one bottle of stock solution. Wright got the same results on the machine, a few days later, using a different bottle of stock solution.
Based on this testimony, we conclude that the appellees' attempt to discredit the accuracy of the Intoxilyzer machines, and the breath test results, based on stock solution's lack of shelf-life study and dating, is too theoretical and speculative. See State v. Benas, 281 N.J.Super. 251, 657 A.2d 445 (A.D. 1995). Given the undisputed testimony that there is but a short time period involved during which the three-ounce bottles of stock solution are used up in the field, which is far shorter than the expert's shortest shelf-life estimate, and the established consistency in results for the machines using different bottles of the stock solution, as a practical matter, no problem with the stock solution's shelf life has yet appeared in this state's general experience.[11]
In this case, the testimony established the stock solution has a much longer shelf life than the time in which it is currently being used in the field, and the potential or theoretical testing problem of using aged stock solution to test the machines has not occurred in connection with these two machines, in particular, based on their maintenance and performance records. The current history of use of the stock solution to test these machines tends to establish the integrity of the machines as well as the stock solution used to test them. See *1162 Hughes v. State, 17 Ark.App. 34, 702 S.W.2d 817 (Ark.App.1986), Op. Supp., 17 Ark.App. 34, 705 S.W.2d 455 (Ark.App. 1986). Further, there are currently no rules or regulations promulgated in Florida which require dating and use of bottles of stock solutions within a shelf-life time. We cannot say FDLE is remiss for not adopting rules or protocols in this regard, based on this record. See State v. Souza, 6 Haw. App. 554, 732 P.2d 253 (1987).

II. Potential Variation or Range in Alcohol Content of the Stock Solution.
As noted above, Wood prepares all of the stock solution used in this state, in his laboratory for FDLE. He testified that he makes up a batch of the solution from time to time and places it in three ounce bottles. He then tests samples of bottles from each batch with a gas chromatography machine to determine the exact amount of ethanol in the stock solution. The exact chemical composition of the batch of stock solution is noted in his laboratory records. The bottles for each batch are not labeled with the exact ethanol-to-water content, but the batch is identified, and (Wood testified) that information is available to the public on request. Further, the identity of the batch of stock solution which is used to test the machines on a monthly and yearly basis is noted on the records kept by FDLE for each machine.
The stock solution prepared by Wood is a combination of water and ethanol. From the stock solution the technicians in the field prepare a simulator solution in order to test the Intoxilyzer machines. The technician uses a 500 millimeter flask. A certain amount of stock solution is placed in the flask and the rest is filled with water. The simulator solution is heated to 34 degrees Centigrade, at which point the solution becomes a vapor which mimics human breath. The technicians are instructed and trained that an increase of one millimeter of stock solution to the flask will produce a .01 increase in the reading on the Intoxilyzer being tested. Therefore, they simply add the assumed appropriate amount of stock solution to the 500 millimeter flask in order to test the machines at the .05., 10 and .20 levels required by the rules.[12] However, the technicians do not know the exact chemical composition of the batch of stock solution being used to test the machine.
Wood testified that in making up the stock solution in his laboratory for use throughout the state, his target is to produce a batch of stock solution that is made up of .1215 grams of ethanol per 210 liters of breath. When the stock solution has that value, an Intoxilyzer machine, which is working perfectly, should read exactly .100. However, Wood testified he did not always hit his target. He considered a range of .116 grams of ethanol per 210 liters of breath to .126 grams of ethanol per 210 liters of breath to be sufficiently scientifically accurate.[13] If the batch of stock solution exceeds that range, he does not send it out to the field for use.
Rule 11D-8.004 provides that before a machine is initially put into service, testing must establish its ability to measure the ethanol content of vapor mixtures with an average error of no more than plus or minus five percent, or plus or minus .005 grams per 210 liters of breath, whichever is greater. For periodic tests, Rule 11D-8.005 sets out a required range of accuracy for a machine at the various required levels. For the required test level of .100 grams of ethanol per 210 liters of breath, a range of .095 to .105 is stated to be acceptable.[14] Appellees argue that the possible additional variation produced by using a .116 stock solution, when added to the machine's permitted range of plus or minus .005, exceeds the legal permissible range of accuracy and renders the breath test results scientifically inaccurate.
Expert testimony established that use of the extremes of Wood's range for the stock solution [.116 to .126] theoretically could produce test scores which vary from the expected .100 reading. Use of stock solution at the highest range [.126] can theoretically work in *1163 a defendant's favor, by allowing a low testing machine to go undetected, and thus produce a breath test result more than .005 lower than is allowed by the rules.
Conversely, and as was the main focus of the expert witnesses' testimony, use of a low ethanol solution [.116] can theoretically hurt rather than help a defendant's test score. If a .116 stock solution is used to test a machine, it should read .097.[15] But on a high-testing machine, it could read .105 (within the plus .005 acceptable range established by the Rules). However, the difference between.097 and .105 is .008. Thus the high-reading machine, tested on a .116 stock solution, could be testing plus .008 rather than plus.005, the acceptable range established by the Rulesa variance of .003. The issue in this case is whether or not that additional theoretical variation makes the breath test results scientifically inaccurate, or not in compliance with the Rules.
It is well established that in order for the results of a defendant's breath test to be admissible in evidence in a DUI prosecution, the tests must be made in compliance with the statutes and administrative rules. State v. Bender, 382 So.2d 697 (Fla.1980); Robertson v. State, 604 So.2d 783 (Fla.1992). In order to establish the admissibility of breath test results, the state must establish the fact that the tests were made in substantial conformity with the applicable administrative rules and the statutes. See State v. Donaldson, 579 So.2d 728 (Fla.1991); Department of Highway Safety Motor Vehicles v. Farley, 633 So.2d 69 (Fla. 5th DCA 1994); State v. Reisner, 584 So.2d 141 (Fla. 5th DCA 1991). Insubstantial differences or variation from approved techniques and actual testing procedures in any individual case do not render the test nor test results invalid. § 316.1934(3), Fla.Stat. (1993); Ridgeway v. State, 514 So.2d 418 (Fla. 1st DCA 1987).
In this case, there are no rules or regulations which have been promulgated concerning the composition of the stock solution which is used to test the Intoxilyzer machines. The evidence presented by the state in this case established the breath tests were made in substantial compliance with the statutes and rules currently in effect. In such a case, the results of breath tests are admissible if they are sufficiently reliable so as to be generally acceptable in the scientific community. See also Souza; State v. Burke, 599 So.2d 1339 (Fla. 1st DCA), rev. denied, 609 So.2d 40 (Fla.1992); State v. Donaldson, 579 So.2d 728 (Fla.1991).
Wood testified that the range of accuracy he established for the chemical composition of the stock solution prepared by him in the FDLE laboratory was sufficiently accurate for scientific purposes. No testimony controverted his position. He also explained that the reason information concerning the exact composition of the stock solution was not sent to the technicians in the field was because they were not trained to use that information. The protocol and techniques were designed by FDLE and Wood to be simple and easy to execute in the field by the technicians. We hesitate to write an opinion that would require the state to have a gas chromatography machine with each Intoxilyzer and an analytic chemist in order to test each machine at the times and levels required by the rules. See Haas v. State, 597 So.2d 770 (Fla.1992). Although that is no doubt the best and most precise way to insure accurate machines, it would be an extremely expensive and difficult burden to place on the state.
We think the state in this case met its burden to establish the admissibility of the breath tests in these cases. See People v. England, 188 Ill.App.3d 9, 135 Ill.Dec. 686, 544 N.E.2d 43 (2 Dist.1989), appeal denied, 129 Ill.2d 567, 140 Ill.Dec. 676, 550 N.E.2d 561 (1990). The appellees' attack on the admissibility, in general, of the results of the breath tests based on the range of composition of the stock solution is speculative and theoretical. See Benas. We do not know in these cases what the breath-test results for these defendants actually were.
However, we also conclude that a defendant should be able to challenge the validity of a breath test result based on the possible variation in range of chemical composition *1164 of the batches of stock solution and argue the test should be disregarded by the trier of fact if the breath test result is so close to one of presumptive levels established by section 316.1934(2) that a possible range in variation in the stock solution used to test the machine could have made a difference when added to the permitted range allowed for the machines pursuant to the rules. See Kansas v. Witte, 251 Kan. 313, 836 P.2d 1110 (1992); State v. Straka, 116 Wash.2d 859, 810 P.2d 888 (1991). Based on the testimony in this record and the mathematics flowing therefrom, a defendant should not be subjected to the application of the statutory presumption of being impaired set by section 316.1934(2)(c) for persons testing at .08, if the breath test result is .082 or less.
This .082 figure is based on the fact that in Florida, an Intoxilyzer machine is permitted under the rules to test .005 on the high side. As discussed above, if that variation is coupled with the use of a batch of low ethanol stock solution to test the machine, the .005 permissible variation may be exceeded by.003. At the theoretical worst, use of a .116 stock solution which should test at .097, could measure .105 on a high-testing machine. The greatest variation which use of the low alcohol level stock solution could produce is.008, the difference between .097 and .105. Thus there is potentially a .003 greater variation possible than that allowed by the rules.
For those defendants whose breath test results exceed .082, the theoretical .003 high-side variation possibly caused by the stock solution would be irrelevant because any additional.003 variation could have no impact on test results over .082. A defendant who tests at .083 or above, could not be hurt by having a test result read above .08 due to the.003 possible variation caused by the stock solution. Any such theoretical deviation should be deemed insubstantial from the point of view of complying with the rules and regulations and the statutes for tests over.082, as well as from a scientific point of view.
However, to the contrary, tests at.082 or less may theoretically have been pushed up to the statutory level of presumed intoxication (.08) by the variation in batches of stock solution. In such cases, the statutory presumption should not be available to the state. However, the state can defend the accuracy of the test by producing the chromatography analysis for the batch of test solution used most recently to test the machine which produced the test result. If it appears the stock solution was close to Wood's target level of .1215, the test will be shown to be valid.
Further, we do not suggest that the state can, in a case where a defendant tests just below .08, attempt to move the test level up, based on the contrary theoretical possibility that a high-level ethanol stock solution was used to test the Intoxilyzer machine that produced the test result, thereby producing a test result below what it should be. Mathematically it appears that even a greater range of error can occur by using a high ethanol test solution on a low testing machine. But this error would be in the defendant's favor.
In all cases, the state has the burden of establishing the reliability of its testing and methods of ensuring the scientific accuracy and reliability of the breath test results. It must do a competent job, but not a perfect one. However, if an error is made in anyone's favor, it must be in the defendant's.
CERTIFIED QUESTIONS ANSWERED; REVERSED and REMANDED for further proceedings.
PETERSON, C.J., and DAUKSCH, J., concur.
NOTES
[1] State v. Friedrich, et al., Case Nos. 95-775; State v. Ameziane, et al., Case No. 95-777; State v. Palazuelos, Case No. 95-926; State v. Peterson, Case No. 95-1202; State v. Rojas, Case No. 95-923; and State v. Perez, Case No. 95-1204.
[2] Judge Carol E. Draper and Judge Frank N. Kaney, Acting County Judge.
[3] § 316.193, Fla.Stat. (1993).
[4] Fla.R.App.P. 9.160(b).
[5] Fla.Admin.Code Rule 11D-8.001 through 8.006.
[6] § 316.1932, Fla.Stat. (1993).
[7] Fla.Admin.Code Rule 11D-8.004.
[8] Fla.Admin.Code Rule 11D-8.005.
[9] Fla.Admin.Code Rule 11D-8.006.
[10] Fla.Admin.Code Rule 11D-8.003(7)(a)2.
[11] This is not to say such an attack on the accuracy of the machines could not be mounted if a shelf life for the solution were established and if it were proved that the time limit was being compromised by the field technicians keeping and not using the stock solution within the established shelf life time or if evidence was presented that the machines had registered outside the range of plus or minus .005, or had varied widely in testing performances due to using an aged stock solution.
[12] Fla.Admin.Code Rule 11D-8.003.
[13] This is a plus or minus .005 variation rounded down.
[14] Fla.Admin.Code Rule 11D-8.006.
[15] According to Morris' expert testimony, the relationship between concentrations of liquid [stock solution] and concentration of vapor at 34 degrees Centigrade (machine results) is determined by multiplying the stock solution concentration by .84.