STATE OF HAWAII, Plaintiff-Appellant, *v.* STEVEN RICHARD
CHRISTIE, Defendant-Appellee

NO. 12438

(DISTRICT COURT NO. T87-645)

MAY 26, 1988

BURNS, C.J, HEEN AND TANAKA, JJ.

## OPINION OF THE COURT BY TANAKA, J.

In a driving under the influence of intoxicating liquor (DUI)[1] case, the State of Hawaii (State) appeals the district court's order suppressing the results of the breath test administered to defendant Steven Richard Christie (Defendant). The basis of the suppression order was the court's holding that the accuracy verification test performed at the time Defendant was administered the breath test was not in strict compliance with the pertinent provisions of Chapter 111 of Title 11 of the Administrative Rules of the State Department of Health.[2] We hold that based on the evidence in the record, the district court's construction of the Rules was incorrect. We therefore reverse.

I.

The following facts are not in dispute. On January 14, 1987, Defendant was arrested for DUI.[3] At the police station Defendant consented to a breath test which was administered on a Model 4011AS intoxilyzer machine (Intoxilyzer). In administering the breath test, police matron Sylvia Dawson (Dawson), a certified Intoxilyzer operator, performed each procedure in the order listed on the "Honolulu Police Department Intoxilyzer Operational Checklist" (Checklist). The Checklist provided for the calibration of the Intoxilyzer by the use of a beam attenuator. The test record card removed from the Intoxilyzer (the last procedure on the

---

[1] Hawaii Revised Statutes (HRS) § 291-4(a) (1985) provides:

Driving under influence of intoxicating liquor. (a) A person commits the offense of driving under the influence of intoxicating liquor if:

    (1) The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor; or

    (2) The person operates or assumes actual physical control of the operation of any vehicle with 0.10 per cent or more, by weight of alcohol in the person's blood.

[2] Chapter 111 of Title 11 of the Administrative Rules is entitled "Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration." After being "amended and compiled," the current version of Chapter 111 became effective on November 22, 1986, and is referred to as the "Rules" in this opinion.

[3] Defendant was also arrested for speeding in violation of HRS § 291C-102 (1985).

Checklist) showed 0.14 percent blood alcohol concentration. The card also indicated a calibration reading of 0.289 percent which was within ± 0.01 percent of the beam attenuator value of 0.292 percent.

After holding an evidentiary suppression hearing, the district court entered its decision and order suppressing the Intoxilyzer test results. The State's appeal followed.[4]

## II.

Since 1983, DUI has been a *per se* offense under Hawaii Revised Statutes (HRS) § 291-4(a)(2) (1985)[5] requiring the mere proof of 0.10 percent or more by weight of alcohol in the driver's blood. And the "implied consent" law, HRS §§ 286-151 to -160 (1985), compels a driver arrested for DUI to submit to a breath or blood intoxication test or lose his driving privilege for a specified period of time. Thus, it behooves the enforcement authorities to assure the accuracy of the intoxication tests being administered by them.

HRS § 321-161 (1985) places "[t]he responsibility of maintaining 'scientific and technical control over chemical testing for blood alcohol' " on the Department of Health (Department). *State v. Tengan*, 67 Haw. 451, 457, 691 P.2d 365, 369 (1984). *See also State v. Nakahara*, 5 Haw. App. 575, 578, 704 P.2d 927, 929 (1985). In undertaking its responsibility the Department has adopted rules and amended them from time to time. These rules are now codified in Chapter 111 of Title 11 of the Administrative Rules.[6]

With the foregoing in mind, we have stated that "in meeting the foundational prerequisites for the admission of the Intoxilyzer test result there must be a showing of strict compliance with those provisions of the Rules which have a direct bearing on the validity and accuracy of the test result." *State v. Souza*, 6 Haw. App. 554, 559, 732 P.2d 253, 257 (1987) (footnote omitted). *See also State v. Rolison*, 6 Haw. App. 569, 571, 733 P.2d 326, 327 (1987).

---

[4] HRS § 641-13(7) (1985) authorizes the State to appeal from "a pretrial order granting a motion for the suppression of evidence," in criminal cases.

[5] *See supra* note 1.

[6] *See supra* note 2.

The question presented on appeal is whether the use of the beam attenuator in the accuracy verification test of the Intoxilyzer strictly complied with the pertinent provisions of the Rules. The district court held that it did not. Based on the evidence in the record, we hold that it did.

### III.

The pertinent provisions of the Rules involved in this appeal are the following:

§ 11-111-1 *Definitions.* As used in this chapter:

\* \* \*

"Reference sample" means a solution, ampoule, lens, or air sample that registers on an appropriate instrument, a known concentration of ethyl alcohol.

\* \* \*

§ 11-111-2.1(j) Testing for accuracy or calibration of all breath testing instruments and related accessories employed pursuant to this chapter shall comply with the following:

(1) The supervisor shall assure that testing for accuracy or calibration is done;

(2) Calibration testing shall be done not less frequently than every thirty days and after every instance of maintenance or repair;

(3) Methods recommended by the manufacturer or approved by the department for the testing for accuracy or calibration shall be employed;

(4) Results of tests for accuracy or calibration shall be noted in a permanent record, as required by Section 11-111-6(a) (2)[.]

§ 11-111-2.1(k) The recommended calibration testing method shall use a minimum of two reference samples of known alcohol concentration at a known temperature within the range of one hundredths to thirty hundredths per cent weight per volume or higher known alcohol concentrations that are recommended by the breath testing instrument's manufac-

turer. The results of the analysis shall agree with the reference sample value within the limits of plus or minus one hundredths per cent weight per volume or such limits set by the director.

§ 11-111-2.1(l) An accuracy verification test shall be performed during the actual breath test sequence of a subject. This test shall be followed by a blanking procedure to insure that no residual sample remains in the instrument. The accuracy verification test shall be the analysis of a suitable reference sample of known alcohol concentration. The result of the analysis shall agree with the reference sample value within limits of plus or minus one hundredths per cent weight per volume or such limits as set by the director.

### A.

The district court focused on § 11-111-2.1(l) (hereafter § 2.1(l)) solely. The court, in essence, held that (1) § 2.1(l) requires the accuracy verification test be by "analysis of a suitable reference sample of known alcohol concentration"; (2) "reference sample of known alcohol concentration" means "a reference sample which contains alcohol"; and (3) a beam attenuator "contains no alcohol, and thus is not 'a reference sample of known alcohol concentration[.]' " Record at 172, 173. It also held that "a beam attenuator is not a 'lens ... that registers on an appropriate instrument a known concentration of ethyl alcohol' within the meaning of 'reference sample' as defined in § 11-111-1[.]" Record at 174. The court therefore concluded that the use of a beam attenuator for the accuracy verification test did not comply with § 2.1(l).

In our view, the district court focused narrowly on § 2.1(l) without considering other pertinent provisions of the Rules.

### B.

General principles of statutory construction apply also to the construction of administrative rules. *Mahiai v. Suwa,* 69 Haw. ___, ___, 742 P.2d 359, 366 (1987); *International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 323, 713 P.2d 943, 950 (1986). A fundamental rule of statutory construction is that

"each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole[,]" *State v. Davis*, 63 Haw. 191, 196, 624 P.2d 376, 380 (1981) and that, if rational and practicable, a court should "give effect to all parts of a statute . . . [so] that no clause, sentence, or word shall be construed as superfluous, void, or insignificant[.]" *Camara v. Agsalud*, 67 Haw. 212, 215, 685 P.2d 794, 797 (1984). *See also Armbruster v. Nip*, 5 Haw. App. 37, 40, 677 P.2d 477, 480 (1984). We apply these principles in construing the Rules.

Section 11-111-2.1(j) (hereafter § 2.1(j)) sets forth the general requirements regarding the "[t]esting for accuracy or calibration of all breath testing instruments[.]" Subsection (3) thereof provides as follows:

> (3) Methods recommended by the manufacturer or approved by the department for the testing for accuracy or calibration shall be employed[.]

Section 11-111-2.1(k) (hereafter § 2.1(k)) is the Department's recommended or approved method of calibration testing required to be done at least every thirty days under § 2.1(j)(2). Section 2.1(1) is the Department's approved method of accuracy verification testing to be performed at the time a subject is being administered a breath test. "Methods recommended by the manufacturer" may be utilized in lieu of the Department's approved methods set forth in §§ 2.1(k) and 2.1(1), since § 2.1(j)(3) authorizes either alternative.

Defendant argues that (1) § 2.1(j)(3) "must be read to limit approval of such methods exclusively to the Department[;]" (2) reading § 2.1(j)(3) as allowing the manufacturer to authorize the utilization of an accuracy verification test other than that specified in § 2.1(1), would render § 2.1(1) a nullity and "would result in an impermissible abdication of the State's role in assuring that the *Rules* are given effect[;]" and (3) therefore the disjunctive "or" in § 2.1(j)(3) must be read as a conjunctive "and" to avoid an "absurd result," as required by HRS §§ 1-15(3) and 1-18 (1985).[7] We cannot

---

[7] HRS § 1-15(3) (1985) reads:

Construction of ambiguous context. Where the words of a law are ambiguous:

\* \* \*

(3) Every construction which leads to an absurdity shall be rejected.

agree with Defendant that our construction of §§ 2.1(j)(3) and 2.1(1) as they are written will lead to an absurd result.

First, the Department deliberately used the disjunctive "or," rather than the conjunctive "and," in § 2.1(j)(3). The Department was aware that where policy consideration so decreed, it could and did require its standards to prevail over those recommended by the manufacturers. For example, in the predecessor rules which were in effect from November 27, 1981 through November 21, 1986, the Department specified in § 11-111-2(a)(7) as follows:

> In addition to those recommended by the manufacturers, there shall be the following procedural safeguards[.]

Second, it is neither unreasonable nor unusual for the Department to rely upon the expertise of the manufacturer and accept the manufacturer's recommended methods of testing the Intoxilyzer for accuracy. Accordingly, we cannot conclude that, by permitting testing methods recommended by the manufacturer under § 2.1(j)(3), the Department abdicated its role of assuring the accuracy of the Intoxilyzer.

Third, Defendant's argument, in effect, limits the methods of accuracy verification testing to those approved by the Department as specified in § 2.1(1). This would render superfluous the words "recommended by the manufacturer" in § 2.1(j)(3), contrary to a rule of statutory construction — truly, an absurd result.

Finally, Defendant urges us that since the § 2.1(1) "wet bath of alcohol solution" method is the "primary" accuracy verification standard, while the beam attenuator method is a "secondary" standard, the § 2.1(1) method should prevail. We are not persuaded by this argument because the prime consideration is the reliability of the method utilized, whether the standard is classified as "primary" or "secondary." The record indicates that the beam attenuator is a reliable means of testing the Intoxilyzer for accuracy.

## IV.

We must next determine whether there is evidence in the rec-

---

HRS § 1-18 (1985) provides:

"Or," "and." Each of the terms "or" and "and" has the meaning of the other or of both.

ord that the performance of an accuracy verification test with a beam attenuator[8] is a method recommended by the manufacturer of the Intoxilyzer. Our answer is yes.

The Checklist is in evidence as Prosecution's Exhibit B. Steps 12, 13, and 14 of the Checklist set forth the procedure to be utilized by the operator to calibrate the Intoxilyzer with the beam attenuator.

Police criminalist Milton Hong (Hong) was qualified as an expert witness regarding the Intoxilyzer. On direct examination, Hong testified as follows:

A This is a Operational Checklist, ah, which shows the 17 steps having been accomplished for the testing of this defendant.

Q [by Deputy Prosecuting Attorney] And, from your experience, what was that checklist derived from?

A This checklist is the product of a consultation between C.M.I [the manufacturer of the Intoxilyzer] and our Police De-

---

[8] The district court made the following findings regarding the beam attenuator:

34. The beam attenuator is an optical accessory purchased through the manufacturer of the intoxilyzer machine, which has a value assigned to that beam attenuator by the manufacturer after comparison of the beam attenuator with a primary standard on a specific Intoxilyzer machine.

35. When a beam attenuator is inserted into the Intoxilyzer in to the path of an infrared beam energy source, the beam attenuator causes a known decrease in the energy or infrared beam.

36. The decrease in energy after passage through the beam attenuator is then read by the Intoxilyzer machine and that amount, or value is displayed on the Intoxilyzer.

37. After the manufacturer of the Intoxilyzer calibrates the Intoxilyzer machine at the factory, using primary standards (solutions which contain known concentrations of ethyl alcohol) and seals the critical components of the instrument with a special glue, the manufacturer then takes a quartz crystal (which the manufacturer calls a beam attenuator), inserts it into the Intoxilyzer and assigns that quartz crystal the value which is displayed on the Intoxilyzer screen.

38. By the use of a beam attenuator a test is made against the known value ascribed to the beam attenuator. But that known value is not in any way related to alcohol concentration.

39. When an intoxilyzer operator uses a beam attenuator that operator is checking the response and display of the Intoxilyzer to a known value—the value of the beam attenuator.

Record at 164.

partment to set up an acceptable D.U.I. testing program with this model intoxilyzer back in 1980.

July 2, 1987 Transcript at 64.

On cross-examination, Hong again testified:

This form [Checklist] was the direct product of consultation between C.M.I. and our Police Department, the design of an acceptable checklist, as I see it.

*Id.* at 75.

We find from the foregoing uncontradicted evidence that the use of the beam attenuator by Dawson when administering the breath test on Defendant was a method of accuracy verification testing recommended by the Intoxilyzer manufacturer. Consequently, there was strict compliance with the Rules regarding accuracy verification testing.

### V.

Accordingly, we hold that the district court erred in suppressing the Intoxilyzer test results.

Reversed and remanded for further proceedings.

*Lila B. LeDuc,* Deputy Prosecuting Attorney, for plaintiff-appellant.

*Paul J. Cunney (Earle A. Partington,* with him on the answering brief and *Dennis M. Klein* with him on the supplemental brief) for defendant-appellee.