**STATE OF HAWAII**, Respondent–Appellant, v. **STEVEN RICHARD CHRISTIE**, Petitioner–Appellee

NO. 12438

(D.C. NO. T87–645)

DECEMBER 29, 1988

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

We granted certiorari to review the approval by the Intermediate Court of Appeals (ICA) of the Honolulu Police Department's use of a "Beam Attenuator" in verifying the accuracy of a breath-testing device, an Intoxilyzer 4011 AS, employed to measure the concentration of alcohol in the blood of putative drunken drivers. A thorough review of the record and the relevant statutes and administrative rules disclosing no error, we affirm the ICA's ruling.

I.

Steven Richard Christie was charged with Driving Under the Influence of Intoxicating Liquor in violation of Hawaii Revised Statutes (HRS) § 291–4. He moved to suppress as evidence the results of the breath test administered shortly after his arrest on January 14, 1987 to determine the concentration of alcohol in his blood. Concluding that the accuracy of the testing instrument used on the occasion was not verified in strict compliance with applicable provisions of chapter 111 of title 11 of the State's Administrative Rules, the District Court of the First

Circuit granted the motion. The district court reasoned that section 11–111–2.1(*l*) of the foregoing rules compelled the performance of an accuracy verification test "during the actual breath test sequence of a subject," the test "must be the analysis of a suitable reference sample of known alcohol concentration," "the quartz crystal beam attenuator [used to verify accuracy in this instance] contain[ed] no alcohol," so "[i]n the instant case no accuracy verification test using a reference sample of known alcohol concentration was performed during the actual breath test sequence of the defendant."

The State of Hawaii appealed, and the case was assigned to the Intermediate Court of Appeals. The ICA found "the district court focused narrowly" on section 11–111–2.1(*l*) in deciding the employment of a beam attenuator to verify the accuracy of the Intoxilyzer 4011 AS was not authorized under the relevant administrative rules. Invoking basic principles of statutory construction that "each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole[,]" *State v. Davis*, 63 Haw. 191, 196, 624 P.2d 376, 380 (1981), and "if rational and practicable, [a court should] give effect to all parts of a statute[,]" *Camara v. Agsalud*, 67 Haw. 212, 215, 685 P.2d 794, 797 (1984), principles which are pertinent also when administrative rules are construed, *Mahiai v. Suwa*, 69 Haw. ____, ____, 742 P.2d 359, 366 (1987), the ICA concluded the district court erred.

The appellate court reviewed the provisions of section 11–111–2.1(j), 11–111–2.1(k), and 11–111–2.1(*l*) of the Department of Health's Rules for the Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration,[1] observing that the general require-

---

[1] Section 11–111–2.1(j), 11–111–2.1(k), and 11–111–2.1(*l*) reads as follows:

(j) Testing for accuracy or calibration of all breath testing instruments and related accessories employed pursuant to this chapter shall comply with the following:

(1) The supervisor shall assure that testing for accuracy or calibration is done;

(2) Calibration testing shall be done not less frequently than every thirty days and after every instance of maintenance or repair;

(3) Methods recommended by the manufacturer or approved by the department for the testing for accuracy or calibration shall be employed;

ments relating to the "[t]esting for accuracy or calibration of all breath testing instruments" are set forth in section 2.1(j), the department's recommended calibration testing method is described in section 2.1(k), and the accuracy verification test to be performed during an actual breath test is described in section 2.1(*l*). The ICA further noted subsection 2.1(j)(3) authorized the use of "[m]ethods recommended by the manufacturer [of the testing instrument] or approved by the department for the testing for accuracy or calibration[.]" *State v. Christie*, 7 Haw. App. ____, ____, 764 P.2d 1245, 1248 (1988). It rejected the defendant's thesis that subsection 2.1(j)(3) "'must be read to limit approval of such methods exclusively to [those approved by] the Department[]'" to avoid (1) a nullification of section 2.1(*l*), (2) "'an impermissible abdication of the State's role in assuring that the *Rules* are given effect[,]'" and (3) an "'absurd result[.]'" *Id.*

There was evidence in the record, the ICA said, "that the beam attenuator is a reliable means of testing the Intoxilyzer for accuracy." *Id.* at ____, 764 P.2d at 1249. And since "the performance of an accuracy verification test with a beam attenuator is a method recommended by [its] manufacturer[,]" *id.* (footnote omitted), the court ruled "there was strict compliance with the [department's] [r]ules . . . ." *Id.* at ____, 764 P.2d at 1250.

---

(4)     Results of tests for accuracy or calibration shall be noted in a permanent record, as required by Section 11–111–6(a)(2);

(k) The recommended calibration testing method shall use a minimum of two reference samples of known alcohol concentration at a known temperature within the range of one hundredths to thirty hundredths per cent weight per volume or higher known alcohol concentrations that are recommended by the breath testing instrument's manufacturer. The results of the analysis shall agree with the reference sample value within the limits of plus or minus one hundredths per cent weight per volume or such limits set by the director.

(*l*) An accuracy verification test shall be performed during the actual breath test sequence of a subject. This test shall be followed by a blanking procedure to insure that no residual sample remains in the instrument. The accuracy verification test shall be the analysis of a suitable reference sample of known alcohol concentration. The result of the analysis shall agree with the reference sample value within the limits of plus or minus one hundredths per cent weight per volume or such limits as set by the director.

The defendant then submitted his application for a writ of certiorari, arguing that section 11–111–2.1(*l*) of the Department of Health's Rules for the Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration required no construction because it "is clear on its face" and the department's "incorporation of the manufacturer's [recommended] method [for verification of accuracy] in § 2.1(j)(3)" was an invalid subdelegation of its rule–making power. He argued too that the department breached the provisions of HRS § 91–3 in authorizing a use of methods recommended by the manufacturer for the verification of accuracy or calibration of testing instruments. Finding the questions posed in the defendant's petition worthy of further discussion, we granted certiorari.

II.

A.

The defendant, we noted at the outset, was charged with Driving Under the Influence of Intoxicating Liquor, an offense which may be established by a showing that a person "operate[d] or assume[d] actual physical control of the operation of [a motor] vehicle [either] while under the influence of intoxicating liquor[]" or "with 0.10 per cent or more, by weight of alcohol in [his] blood." HRS § 291–4. And by virtue of HRS § 291–5 "the amount of alcohol found in the defendant's blood within three hours after the time of the alleged [offense] as shown by chemical analysis or other approved analytical techniques of the defendant's blood or breath [is] competent evidence [to establish] that [he] was under the influence of intoxicating liquor at the time of the alleged [offense]." The analytical technique we are concerned with here is infrared absorption spectrometry, and the testing instrument in question is the Intoxilyzer 4011 AS.

"With the advent of advanced infrared (IR) breath alcohol analyzer and microprocessor technology, IR spectrometry has become a major technique in the quantitative analysis of breath for alcohol content." Goldberger & Caplan, *Infrared Quantitative Evidential Breath–Alcohol Analysis: In Vitro Accuracy and Precision Studies*, 31 J. Forensic Sci. 16 (1986). The technique is founded on knowledge that "[w]hen organic compounds such as ethanol, acetone, benzene, and many others, are exposed to infrared radiation, they absorb the radiation of certain frequen-

cies and not others." Fitzgerald & Hume, *Intoxication Test Evidence: Criminal and Civil* 140 (1987). When the Intoxilyzer was originally developed, "[t]he infrared wavelength used by the [instrument] coincide[d] with a major absorption band of ethyl alcohol, 3.39 microns, representative of C[arbon]-H[ydrogen] stretching, molecular bond vibrations." Harte, *An Instrument for the Determination of Ethanol in Breath in Law Enforcement*, 16 J. Forensic Sci. 493 (1971).[2] Though this absorption band is sensitive to alcohol it is sensitive also to other organic substances that have carbon and hydrogen molecular bonds. Brent & Stiller, *Handling Drunk Driving Cases* 166 (1985). "In particular, the [original] instrument was unable to distinguish alcohol from acetone, a fault for which it was often criticized." *Id.* The manufacturer met the problem when it introduced the Intoxilyzer 4011 AS "which measured absorption of two wavelengths, 3.39 and 3.48 microns, a combination designed to detect the presence of acetone in the breath." *Id.* This model was the one approved for use by the county police departments on December 16, 1980. *See State v. Tengan*, 67 Haw. 451, 461, 691 P.2d 365, 372 (1984).

"The basic physical characteristics of the Intoxilyzer[, however,] are similar in all 4011 models." Brent & Stiller, *supra*, at 167. "In all, operation is far easier than with the wet chemical breath testing devices. No chemicals are needed for the test[, and the] test sequence is several times faster than [that in] the wet chemical breath testing device's." *Id.* at 166. "Calibration [of an Intoxilyzer] is done [by the manufacturer] at the factory." *Id.* at 167.

For jurisdictions like Hawaii where the accuracy of the testing instrument must be verified in each test sequence, the manufacturer recommends that a two-phase verification system be followed. It recommends

---

[2] The manual supplied by the manufacturer provides the following description of how the instrument works:

Internally, the Intoxilyzer utilizes well accepted technologies based on sound physical principles. Selected narrow band infrared energy is passed through a sample chamber alternately filled with ambient air and breath from the subject under test. The infrared energy is absorbed in proportion to the alcohol concentration present in accordance with well established physics. The calculated concentration is then displayed digitally and if the test has been conducted properly, printed on a multicopy print-out for a permanent record.

the use of a wet bath simulator as a standard for calibration verification at scheduled intervals. And for accuracy verification during each test sequence, it recommends the use of an accessory developed to quickly perform the required task as a secondary standard. The accessory, denominated a Beam Attenuator by the manufacturer, is a circular piece of quartz encased in a rectangular metal holder; the quartz absorbs a known quantity of the infrared radiation emitted by the Intoxilyzer's light source when the accessory is placed in the instrument. Each Beam Attenuator is matched to a particular Intoxilyzer,[3] and the "Certificate of Calibration Verification" supplied by the manufacturer advises the user of the reading that is displayed digitally to verify accuracy when the Beam Attenuator is employed as the testing standard. The certificate for the Intoxilyzer used to measure blood alcohol concentration (B.A.C.) in this instance reads as follows:

> This is to certify that the calibration of INTOXILYZER serial number 27–102370, manufactured by CMI INC. a subsidiary of Federal Signal Corporation of Park Forest South, Illinois, is verified when used with Beam Attenuator Accessory serial number Q–102370, to exhibit a reading of .292 ± .01% B.A.C.

---

[3] The following findings entered by the district court aptly describe how the accessory functions and how it is matched to an Intoxilyzer:

35. When a beam attenuator is inserted into the Intoxilyzer in to the path of an infrared beam energy source, the [quartz] causes a known decrease in the energy or infrared beam.

36. The decrease in energy after passage through the beam attenuator is then read by the Intoxilyzer machine and that amount, or value is [digitally] displayed on the Intoxilyzer.

37. After the manufacturer of the Intoxilyzer calibrates the Intoxilyzer machine at the factory, using primary standards (solutions which contain known concentrations of ethyl alcohol) and seals the critical components of the instrument with a special glue, the manufacturer then takes a quartz crystal (which the manufacturer calls a beam attenuator), inserts it into the Intoxilyzer and assigns that quartz crystal the value which is displayed on the Intoxilyzer screen.

## B.

Since "[t]he responsibility of maintaining 'scientific and technical control of chemical testing for blood alcohol' . . . is that of the Department of Health[,]" *State v. Tengan*, 67 Haw. at 457, 691 P.2d at 369, the use of an Intoxilyzer to measure blood alcohol is controlled by the department. HRS § 321–161 directs the department to establish *inter alia* appropriate procedures for "specimen selection, collection, handling and analysis" and vests it with authority to adopt the necessary rules and regulations. What was adopted pursuant to this authority is now codified in chapter 111 of title 11 of the Hawaii Administrative Rules.[4]

As the ICA noted, the general requirements relating to "'[t]esting for accuracy or calibration of all breath testing instruments[,]'" *State v. Christie*, 7 Haw. App. at _____, 764 P.2d at 1248, are set forth in section 11–111–2.1(j) of the department's Rules for the Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration (the Rules), the department's recommended calibration testing method is described in section 11–111–2.1(k), and the accuracy verification test to be performed during an actual breath test is described in section 11–111–2.1(*l*). *See supra* note 1. Calibration testing is required "not less frequently than every thirty days," and the department's recommended testing method calls for the use of at least "two reference samples of known alcohol concentration." *Id.* For accuracy verification during each test sequence, the Rules call for the use of "a suitable reference sample of known alcohol concentration." *Id.* "Reference sample" is defined in section 11–111–1 of the Rules to mean "a solution, ampoule, lens, or air sample that registers on an appropriate instrument, a known concentration of ethyl alcohol." And section 11–111–2.1(j)(3) provides that "[m]ethods recom-

---

[4] The Hawaii Administrative Rules are codified in a format that "brings all agency rules adopted pursuant to the Hawaii Administrative Procedure Act (chapter 91, HRS) into a single numbering system [consisting] of a series of titles, with each title divided into chapters, and each chapter divided into sections." Hawaii Administrative Rules Directory 1. The Rules adopted by the Department of Health are codified under title 11. The Rules covering the Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration are now found in chapter 111 of title 11; they were formerly in chapter 47 of the Public Health Regulations.

mended by the manufacturer or approved by the department for the testing for accuracy or calibration shall be employed[.]"

## III.

The defendant urges that the Rules clearly called for the use of a wet bath simulator in verifying the accuracy of the Intoxilyzer during the breath test administered to him by the Honolulu Police Department and that the use of a Beam Attenuator as a standard for accuracy pursuant to the manufacturer's recommendation rendered the results of the test inadmissible as evidence. Though the Rules provide that methods recommended by the manufacturer may be employed to verify accuracy, he argues the rule–making power of the Department of Health cannot be delegated to the manufacturer. But we conclude the Rules allow the use of a Beam Attenuator in verifying accuracy and no invalid delegation of rule–making authority occurred. And like the ICA we reach these conclusions after reading each applicable part of the Rules "in connection with every other [applicable] part" and giving "a sensible . . . effect to each." *State v. Davis*, 63 Haw. at 196, 624 P.2d at 380 (citations omitted).

## A.

We begin our analysis by examining a relevant part of the administrative regulations that dealt with "Breath Testing Instruments" at the time the Intoxilyzer was placed on the approved list of instruments employable in evidential breath testing. The relevant regulation, section 2A of chapter 47 of the Public Health Regulations, stated that "[o]nly instruments and their related accessories approved by the Department [of Health] shall be employed."[5] The regulation compelled "the manufacturer or the agency requesting [such] approval to provide the Department

---

[5] Section 2A in relevant part read:

**Section 2. Breath Testing Instruments**

    A. The method of analysis using a breath testing instrument for the determination of equivalent blood alcohol content from a person's breath sample shall be approved by the Director of Health and shall comply with the following:

with the instrument and related accessories; chemical reagents; detailed set of instructions pertaining to the operation, calibration, and mainte-

---

1. Analysis shall be performed only by personnel meeting the requirements of Section 2–E, 1 and 2–F, 1 of this regulation.

2. Only instruments and their related accessories approved by the Department shall be employed.

3. The quantity of breath analyzed for its alcohol content shall be established only by direct volumetric measurement or by collection and analysis of a fixed breath volume at a constant temperature.

4. The instrument or related accessories shall be capable of analyzing a suitable reference sample, such as air equilibrated with a reference solution of known alcohol concentration at a known temperature within the range of 0.01 to 0.30% W/V. The results of such analysis must agree with the reference sample value within the limits of 0.01% W/V or other such limits set by the Director.

5. The instrument and related accessories shall be capable of analyzing an alcohol free person which results in a concentration less than 0.01% W/V.

6. The analysis shall be performed only according to the instructions of the manufacturers or by the Director. Such instructions shall be on file in the area where tests are performed.

7. In addition to those recommended by the manufacturers, there shall be the following procedural safeguards:

    a. Continuing observation of the subject for a minimum of 15 minutes prior to collection of the breath sample, during which period the subject shall not have ingested alcohol or vomitted. If this subject vomits, wait 15 minutes before collecting the breath sample.

    b. The temperature of the instrument is stable.

    c. A system of blank analysis.

    d. Analysis of a suitable reference sample of known ethyl alcohol concentration. The results of such analysis must agree with the reference sample value within the limits of 0.01% W/V or such limits set by the Director.

    e. The lot number of the reference sample used shall be noted.

8. It shall be the responsibility of the manufacturer or the agency requesting the evaluation of a breath testing instrument for approval to provide the Department with the instrument and related accessories; chemical reagents; detailed set of instructions pertaining to the operation, calibration, and maintenance; interpretation of results; and any other material needed for the evaluation; and shall provide the Department with such technical consultation as is necessary during the evaluation.

nance; interpretation of results; and any other material needed for the evaluation[.]" *See supra* note 5. And it was the department's responsibility to evaluate what was submitted and decide whether the instrument and related accessories met the stringent performance standards prescribed in "Section 2–A, 3, 4, and 5." *Id.* The department found the Intoxilyzer and its related accessories met the prescribed standards in December of 1980, and the instrument and the accessories have since been used by the county police departments to measure blood alcohol concentration.

The defendant's primary thesis, however, is not that the accessory in question provides an erratic or imprecise reference sample for verifying the accuracy of an Intoxilyzer; it is that the Department of Health "did not intend [to authorize the use of a Beam Attenuator] as an alternative method for an accessory verification test." "Had it so intended," he argues, "[the method] would have been included in [section 11–111–2.1(*l*) of the Rules] because that rule is quite detailed and explicit in the procedure to be followed." If "its use were even contemplated," he maintains, "the Department certainly would have reference to it and described its method of use somewhere in Title 11 [of the Hawaii Administrative Rules]."

True, "Beam Attenuator" is not to be found in section 11–111–2.1(*l*); the rule in relevant part provides that "[t]he accuracy verification test [to be performed during the actual breath test sequence] shall be the analysis of a suitable reference sample of known alcohol concentration." Without more, the use of an accessory containing no alcohol as a reference sample for verifying the accuracy of the testing instrument would appear to be precluded. For purposes related to chapter 111, however, "'Reference sample' means a solution, ampoule, lens, or air sample that registers on an appropriate instrument, a known concentration of ethyl alcohol." Hawaii Administrative Rules § 11–111–1.

That "solution" would cover a wet bath simulator of known alcohol concentration, of course, is beyond cavil; that an "ampoule" could hold a

---

9. It shall be the responsibility of the Department to evaluate the instruments as recommended in Section 2–A, 3, 4, and 5.

Substantially similar provisions are found in section 11–111–2.1(a) of the Hawaii Administrative Rules.

solution with a known quantity of alcohol is not to be doubted; and that an "air sample" with a known quantity of alcohol dispersed therein could be prepared is not to be doubted too. But as the district court observed, a "lens" contains no alcohol. Still, the framers of the definition designated a "lens" as a possible reference sample. Were we to follow the district court's reasoning and hold a "lens" is not a suitable reference sample because it contains no alcohol, we would be rendering superfluous a portion of the Department of Health's definition of "reference sample."

An agency's policy declaration ought not be cast aside lightly. "[E]ach part [of a rule like] each part . . . of a statute should be construed in connection with every other part . . . so as to produce a harmonious whole." *State v. Davis*, 63 Haw. at 196, 624 P.2d at 380 (citation omitted). "[E]very part . . . must be viewed in connection with the whole so as to make all parts harmonize, if practicable," and sensible effect must be given to each. *Id.* Viewing the definition of "reference sample" in section 11–111–1 in connection with section 11–111–2.1(j), (k), (*l*) and giving sensible effect to the definition, we conclude a Beam Attenuator matched to a particular Intoxilyzer is a suitable reference sample for verifying its accuracy.

Among the definitions of "lens" given by a recently published dictionary are the following:

1. a piece of transparent substance, usually glass, having two opposite surfaces either both curved or one curved and one plane, used in an optical device in changing the convergence of light rays, as for magnification, or in correcting defects of vision. 2. a combination of such pieces. 3. some analogous device, as for affecting sound waves, electromagnetic radiation, or streams of electrons.

*The Random House Dictionary of the English Language* 1101 (unabr. rev. ed. 1987). The term in our opinion is broad enough to accommodate a circular piece of quartz that absorbs a known quantity of infrared radiation emitted by a particular source. A Beam Attenuator absorbs infrared radiation, so it is a device that affects electromagnetic radiation.[6] Moreover, it

---

[6] The dictionary cited earlier defines "electromagnetic radiation" as "radiation consisting of electromagnetic waves, including radio waves, infrared, visible light, ultraviolet, x–rays, and gamma rays." *The Random House Dictionary of the English Language, supra*, at 629.

provides a precise and constant standard for verifying the accuracy of an Intoxilyzer. For when placed in the path of a properly functioning Intoxilyzer's beam, the accessory causes the instrument to exhibit a predetermined reading "± .01% B.A.C."

The defendant, however, argues the Department of Health would have mentioned Beam Attenuator and described its use if such use were intended. The district court apparently found his thesis convincing, citing the department's subsequent rejection of a suggestion advanced by the office of the public prosecutor to amend the definition of "reference sample" to include "beam attenuator" as evidence that all reference samples "when tested on the breath testing instrument, would display values of actual alcohol and not values which merely simulated alcohol concentration." But the record reveals the department had a reason for rejecting the suggestion for change—as it said, this would have "dilute[d] the definition and the purpose of the definition."

Beam Attenuator, as we observed earlier, is not a generic term. It is a trade name bestowed on a particular accessory by the manufacturer of a breath testing instrument "utilizing well accepted technologies based on sound physical principles." The Intoxilyzer is but one of several infrared absorption instruments developed to employ these technologies in breath testing; the Breathalyzer 2000 and the BAC Verifier are others now in use. *See* Fitzgerald & Hume, *supra*, at 142–46. Since approval by the department of other infrared absorption devices and their accessories may be sought hereafter, we would have to agree that the specific inclusion of a "Beam Attenuator" as a suitable reference sample might not have served a salutary purpose. If other manufacturers chose to develop accessories that absorb infrared radiation in known quantities to be used as reference samples for accuracy verification, they would hardly be likely to apply that term to their radiation absorbers.

## B.

Having decided that the Rules for the Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration permit a reliance on a Beam Attenuator in verifying the accuracy of an Intoxilyzer, we turn to the defendant's contention that the incorporation of a manufacturer's recommended method for verification of accuracy in section

11–111–2.1(j)(3) of the Rules constituted an impermissible subdelegation of rule–making authority.

We recognize that legislation empowering "private persons to decide what the law shall be" may be invalid. 1 Singer, *Statutes and Statutory Construction* § 4.11 (Sutherland 4th ed. 1985). "We are mindful too," we said in *State v. Tengan*, "that 'state legislation which adopts by reference *future* legislation, rules, or regulations, or amendments thereof, which are enacted, adopted, or promulgated by another sovereign entity [would constitute] an unlawful delegation of legislative power.' *People v. Urban*, 45 Mich. App. 255, 262, 206 N.W.2d 511, 516 (1973) (citations omitted) (emphasis in original)." 67 Haw. at 463, 691 P.2d at 373. But we are not confronted with a situation in which private persons or other sovereign entities have been authorized to decide what the Hawaii Rules controlling the use of breath testing instruments shall be—the Rules have been adopted by the Department of Health pursuant to a grant of authority in HRS § 321–161.

The Rules codified in title 11, chapter 111 of the Hawaii Administrative Rules comprise a comprehensive scheme covering all aspects of blood and breath testing for evidential purposes. The specific Rules governing the use of breath testing instruments, we noted, begin with a mandate that "[a]ll devices used to determine equivalent blood alcohol content from breath samples shall be approved by the director." Hawaii Administrative Rules § 11–111–2.1(a). The Rules go on to make approval contingent upon the instrument's capacity to meet performance standards prescribed by the department. *Id.* And they describe the methods to be followed in calibration and accuracy testing. *See supra* note 1. The vice of this aspect of the Rules, the defendant urges, is that it allows testing to be carried out in accord with methods recommended by the instrument's manufacturer.

We would be concerned if the Rules did not call for a thorough evaluation of an instrument's capacity to accurately measure blood alcohol concentration before approval. But section 11–111–2.1 in relevant part provides:

(c)  The manufacturer or the agency requesting evaluation of a breath testing instrument for the purpose of approval shall provide the department with the following:

(1)  Instrument;

(2)  Related accessories;

(3) Chemical reagents;

(4) Detailed set of instructions pertaining to the operation, calibration, and maintenance of the instrument;

(5) Interpretation of results; and

(6) Any other material needed for the evaluation. Technical consultation, as necessary, shall also be provided to the department during the evaluation.

That the instrument and related accessories have been found accurate when used as intended by their designer and manufacturer is thus implicit in the department's approval. For section 11–111–2.1(d) provides "[t]he department shall evaluate the instrument for compliance with subsection (a)[,]" which describes the stringent performance standards the instrument must meet.

Under these circumstances, we could not say the incorporation of the manufacturer's recommended method for testing accuracy in section 11–111–2.1(j)(3) of the Rules constitutes an impermissible subdelegation of rule–making authority. The section does not empower "private persons to decide what the law shall be," 1 Singer, *supra*; it merely allows accuracy testing to be conducted in accord with the manufacturer's instructions which were submitted for examination and approval along with the instrument and accessories. Like the ICA, we find it logical to follow what the manufacturer has recommended in testing the accuracy of an Intoxilyzer. In our view it would be foolhardy not to follow the "instructions pertaining to the operation, calibration, and maintenance of the instrument" issued by the manufacturer of a sensitive device designed to measure blood alcohol concentration, especially after the responsible agency has evaluated the instrument and found it is capable of meeting the performance standards set for such instruments.

A review of the record, the relevant statutes, and the relevant rules revealing no error, the decision of the Intermediate Court of Appeals is affirmed.

*Paul J. Cunney* for petitioner–appellee.

*Lila B. LeDuc*, Deputy Prosecuting Attorney, for respondent–appellant.