145 P.3d 861

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Chester RABUSITZ, Defendant–Appellant.**

**Nos. 26555, 26556.**

Intermediate Court of Appeals of Hawai'i.

Oct. 2, 2006.

---

Jon N. Ikenaga, Deputy Public Defender, on the briefs, for Defendant–Appellant.

Glenn H. Shiigi, Deputy Prosecuting Attorney, County of Hawai'i, on the briefs, for Plaintiff–Appellee.

LIM, PRESIDING JUDGE, FOLEY and NAKAMURA, JJ.

Opinion of the Court by LIM, P.J.

In this consolidated appeal (Nos. 26555 & 26556) Chester A. Rabusitz, Jr. (Defendant) appeals the two April 5, 2004 judgments of the District Court of the Third Circuit (district court)[1] which, respectively, convicted him of driving under the influence of alcohol (DUI) while under the age of twenty-one,[2] and found him liable for driving without headlights.[3]

We reject Defendant's thesis that the approval of a breath alcohol testing instrument, in this case the Intoxilyzer 5000EN, is subject to strict compliance with State Department of Health (DOH) rules. Hence we hold that the district court did not abuse its discretion in admitting the breath alcohol test result into evidence, and affirm.

## I.

Evidence essentially undisputed at trial and on appeal revealed the following. On February 8, 2003, at about 9:00 p.m., Hawai'i County Police Department (HCPD) Officer Robert Hatton (Officer Hatton) was manning a DUI roadblock on Highway 11 in Puna. As Defendant's car approached, Officer Hatton observed that one headlight was out. Defendant's driver's license showed that Defendant was twenty years old. Officer Hatton noticed physical indicia of alcohol consumption, whereupon he administered field sobriety tests and a preliminary alcohol screening test. Officer Hatton then arrested Defendant and drove him to the Kea'au police station, where Defendant blew .058 on the breath alcohol test.

Officer Hatton measured Defendant's breath alcohol using an Intoxilyzer Model 5000EN, serial number 68–011664, manufactured by CMI, Inc. of Owensboro, Kentucky. The State introduced into evidence Officer Hatton's HCPD "Intoxilyzer 5000 Operator License," effective 6/8/00 and expiring 6/8/03, certifying that Officer Hatton had "satisfac-

---

1. The Honorable Matthew S.K. Pyun presided.

2. Hawaii Revised Statutes (HRS) § 291E–64(a) (Supp.2005) provides, in pertinent part: "It shall be unlawful for any person under the age of twenty-one years to operate any vehicle with a measurable amount of alcohol."

3. HRS § 291–25(a) (1993) reads, in relevant part: "From thirty minutes after sunset until thirty minutes before sunrise, every motor vehi-

cle moving upon any public highway shall carry at the front thereof at least two lighted head lamps which shall display white lights of equal candle power." On appeal, Defendant does not challenge the finding of liability for driving without headlights or the fees and fine imposed for the infraction. Accordingly, we affirm that April 5, 2004 judgment (Case No. H37969H, Sup.Ct. No. 26556), as a matter of course.

torily completed a course in the operation of the Intoxilyzer 5000" and was qualified to administer the test in accordance with DOH Rules. Eight days before the incident, HCPD Detective Sergeant Christopher D. Gali had performed the required monthly accuracy test on serial number 68–011664, finding it properly maintained and in proper working order.

## II.

Defendant's sole defense at trial and his only point on appeal was and is that there was insufficient foundation to admit his breath alcohol test result into evidence. Specifically, Defendant contends the State failed to show that the Intoxilyzer Model 5000EN was approved in proper compliance with DOH rules governing the approval of breath alcohol testing instruments.

## A.

Hawaii Revised Statutes § 321–161 (Supp. 2005) provides:

(a) The department of health shall establish and administer a statewide program relating to chemical testing of alcohol concentrations or drug content for the purposes of chapters 286, 291, 291C, and 291E, with the consultation of the state director of transportation. Under the program, appropriate procedures shall be established for specifying:

(1) The qualifications of personnel who administer chemical tests used to determine alcohol concentrations or drug content;

(2) The procedures for specimen selection, collection, handling, and analysis; and

(3) The manner of reporting and tabulating the results.

(b) The director of health may adopt rules pursuant to chapter 91 necessary for the purposes of this section.[4]

(Footnote supplied.)

The DOH rules referred to by Defendant, Hawaii Administrative Rules (HAR) §§ 11–114–5 and –6 (eff. Dec. 30, 1993), provide:

§ 11–114–5 *Instrument approvals.* (a) Breath alcohol tests shall be performed using a model of:

(1) Breath alcohol testing instrument;

(2) Breath alcohol testing instrument accessories; and

(3) Accuracy verification device

which are approved by the DUI coordinator.[5]

(b) The model specifications of NHTSA[6] for evidential breath alcohol testing devices and for calibrating units (referred to in this subchapter as accuracy verification devices)[7] for breath alcohol testers, as contained in 49 CFR, No. 242, pp. 48854–48865 and 49 CFR, No. 242, pp. 48865–48872, respectively, are integrated into and made a part of this subchapter. Accordingly, those models of instruments, accessories, and calibrating units appearing in the "Conforming Products List of Evidential Breath Measurement Devices" as contained in 57 CFR, No. 46, pp. 8375–8376, and "Conforming Products List of Calibrating Units for Breath Alcohol Testers" as contained in 56 CFR, No. 54, pp.

**4.** *See also State v. Kotis*, 91 Hawai'i 319, 331, 984 P.2d 78, 90 (1999) ("Administrative rules, like statutes, have the force and effect of law." (Citations omitted.)).

**5.** Hawaii Administrative Rules (HAR) § 11–114–4 (eff. Dec. 30, 1993) defines "DUI coordinator" as "the director of health or the individual(s) authorized by the director of health to represent the director of health in matters pertaining to this chapter."

**6.** HAR § 11–114–4 defines "NHTSA" as "the National Highway Traffic Safety Administration, a division of the Federal Department of Transportation."

**7.** HAR § 11–114–4 defines "accuracy verification device" as "a device or apparatus used to substantiate the accuracy of a breath alcohol testing instrument when a breath alcohol test or an accuracy test is conducted. These devices or apparatus may be internal, external, integral parts of or attachments to breath alcohol instruments. Simulators (referred to by the NHTSA as 'calibrating units for breath alcohol testers') are an example of one type of accuracy verification device, but other devices or apparatus approved by the NHTSA or the department[of health] for such use also qualify as accuracy verification devices."

118[1]7–11819, are approved by the DUI coordinator for purposes of this subchapter.

(c) The DUI coordinator may approve, in writing, modified versions of approved instruments, accessories, and accuracy verification devices. Approval will be contingent upon the continued performance of the instrument, accessory, or calibrating [sic] within the specifications set forth in subsection (b).

(d) All breath alcohol testing devices approved by the director of health as of the effective date of this chapter shall remain approved unless the approval is specifically revoked by the director of health in writing.

§ 11–114–6 *Procedure approvals and measurement requirements.* (a) Except as provided in subsection (c), every breath alcohol testing procedure shall be approved by the DUI coordinator in writing and shall include, but not be limited to:

(1) Performance of an accuracy verification test[8] with each breath alcohol test, using an approved accuracy verification device; and

(2) Inclusion of an air blank before and after each breath test.

(b) With every breath alcohol test the following shall be met:

(1) The person to be tested shall not have ingested alcoholic beverages, eaten, smoked, or vomited for at least fifteen minutes before the breath alcohol test;

(2) The test shall be conducted using an approved instrument in conformance with section 11–114–5 and following an approved procedure as specified in subsection (a);

(3) A copy of the approved breath alcohol testing procedure shall be accessible to the operator or supervisor;

(4) The test shall be conducted by a person who is licensed as a breath alcohol testing supervisor or operator pursuant to section 11–114–9 or 11–114–10;

(5) The result of the accuracy verification test shall be within the range of plus or minus 0.01, or plus or minus ten per cent of the target value, whichever is greater;

(6) Breath alcohol and accuracy verification test results shall not be rounded up; and

(7) Each breath alcohol test shall have been preceded by an accuracy test[9] which meets the criteria of section 11–114–7, by not more than thirty-one days.

(c) Any breath alcohol testing procedure approved by the director of health as of the effective date of this chapter shall continue to be approved and remain in effect unless superseded or revoked by the director of health in writing.

(Footnotes supplied.)

**B.**

Defendant makes two primary arguments in support of his contention that the Intoxilyzer 5000 EN was not properly approved under DOH rules. First, Defendant claims that

all breath alcohol tests must be performed using an "approved" model of breath alcohol testing instrument. HAR § 11–114–6(b)(2). Under the plain language of HAR § 11–114–5, there are only two ways for an instrument to be approved:[10] (1) inclusion in the list of conforming products contained in 57 CFR, No. 46, 8375–76 [HAR

---

**8.** HAR § 11–114–4 defines "accuracy verification test" as "a test performed in conjunction with a breath alcohol test to verify the accuracy of the breath alcohol testing instrument using an accuracy verification device."

**9.** HAR § 11–114–4 defines "accuracy test" as "a test performed periodically using a simulator as an accuracy verification device to establish the accuracy of a breath alcohol testing instrument."

**10.** We note here the implicit but debatable assumption that HAR § 11–114–5(a) (eff. Dec. 30, 1993)—which seems to allow the DUI coordinator to approve a breath alcohol testing instrument, without more—is not a third and entirely independent avenue of approval under the State department of health rules.

§ 11–114–5(b)]; or (2) specific written approval by the DUI coordinator as a "modified version" of an approved instrument [HAR § 11–114–5(c)].[11] The EN did not meet either of these requirements, hence it was not an "approved instrument" and could not be used to perform a valid breath alcohol test.

Opening Brief at 24–25 (brackets in the original; footnotes supplied).

The list of breath alcohol testing instruments approved by "57 CFR, No. 46, pp. 8375–8376" and incorporated by reference into HAR § 11–114–5(b), as shown On Defendant's Exhibit A in evidence, includes the following instruments manufactured by CMI, Inc.:

CMI, Inc., Owensboro, KY

Intoxilyzer Model
1400
4011
4011A
4011AS
4011AS–A
4011AS–AQ
4011  AW
4011A27–10100
4011A27–10100   with filter
5000
5000   (w/Cal. Vapor Re–Circ.).
5000   (w/3/8″ ID Hose option).
5000   (CAL DOJ)
5000   (VA)

PAC 1200
SD–2

Conforming Products List of Evidential Breath Testing Devices, 57 Fed.Reg. 8,376 (Mar. 9, 1992).[12]

Although the DUI coordinator testified at trial that the Intoxilyzer 5000EN is the listed Intoxilyzer 5000, or at least one of many series or iterations of the 5000, *see* section IV, *infra*, Defendant insists that the 5000EN is not an approved instrument under HAR § 11–114–5(b) because it is not specifically listed, especially in light of the fact that several other models of the 5000 are. Too, Defendant points to the numerous differences between the 5000 and the 5000EN catalogued by the DUI coordinator himself:

In fact, [the DUI coordinator] conceded that there were "real differences" between the 5000 and EN models. These differences included: five specific electrical changes, eight changes in the multichannel processor, five changes in the [central processing unit], four changes in the mother board and six changes in the sample cell. *See* RA: Defense Exhibits "B" through "G". [The DUI coordinator] also stated that there were "major series changes" between the 5000 models and "distinct changes" in the training protocols for the 5000 and the EN. (8/5/03 TR: 22).

Opening Brief at 26.

Hence, Defendant avers, the only other way the DUI coordinator could have ap-

**11.** Query whether HAR § 11–114–5(c) (eff. Dec. 30, 1993), when it refers to "modified versions of approved instruments," means new models of approved instruments, as Defendant would have it, or approved instruments with aftermarket modifications.

**12.** A more current list of approved instruments not yet incorporated by reference into HAR § 11–114–5(b), State's Exhibit 3 in evidence, includes the following breath alcohol testing instruments manufactured by CMI, Inc.:

CMI, Inc., Owensboro, KY:
Intoxilyzer Model:
  200
200D
300
400
400PA
1400
4011

4011A
4011AS
4011AS–A
4011AS–AQ
4011AW
4011A27–10100   .
4011A27–10100   with filter
5000
5000   (w/Cal. Vapor Re–Circ.)
5000   (w/3/8″ ID Hose option)
5000CD
5000CD/FG5
5000EN
5000   (CALDOJ)
5000VA
8000
PAC1200
S–D2
S–D5
Conforming Products List of Evidential Breath Measurement Devices, 67 Fed.Reg. 62,091, 62,-092 (Oct. 3, 2002).

proved the 5000EN would be "in writing," as a "modified version[ ]" of the 5000. HAR § 11–114–5(c). Here again, the DUI coordinator maintained at trial that he did not need to, because the 5000EN is the already approved 5000, and not a modified version thereof. By the same logic, but in the alternative, the DUI coordinator testified that he did indeed approve the 5000EN in writing, via his previous written approval of the 5000.[13] *See* section IV, *infra*. To these rejoinders, Defendant raises the same objection—that the 5000EN cannot be considered the same instrument as the 5000 under the DOH rules, for the reasons recounted above.

### C.

For his other primary argument, Defendant asserts that the 5000EN is not an approved instrument under DOH rules because it lacks the accuracy verification test—"within the range of plus or minus 0.01, or plus or minus ten per cent of the target value, whichever is greater"—that is required by HAR §§ 11–114–6(a)(1) and –6(b)(5). Defendant explains:

> Instead of performing an accuracy test utilizing a reference sample of a known concentration, the EN performed what [the DUI coordinator] described as an "electr[on]ic simulation" or a "self test." Supposedly the EN would electronically simulate five different alcohol concentration[s] and test each of those against its own internal results. If the machine failed its own, subjective, "internal standards" test, it would not allow a test to be run. However, there was no evidence proffered as to what the acceptable range was for the internal results. Thus, there was no

sufficient foundation that the Intoxilyzer was in fact performing within the range mandated by HAR § 11–114–6(b)(5).

Opening Brief at 29. Here, Defendant is just plain wrong on the facts, because the DUI Coordinator testified that the 5000EN self-tests to a tolerance of five percent. *See* section IV, *infra*.

What is left to his argument, then, is a vaguely Luddite suspicion of the absence of hard-copy numerical evidence of a valid self-test:

> In other words, a malfunctioning machine might conduct a malfunctioning internal test and without the use of an objective, external standard, i[.]e., a test sample of known concentration, there would be no way to establish that it was producing accurate test results within the mandated range. Indeed, the printout from the EN only indicated that it had "passed" its "internal STD", without showing what the electronically-simulated sample concentration had been as compared to the machine's result. By contrast, the printout from the 5000 showed a "cal check" (calibration check) reading comparing the results of the machine with a test sample of known concentration, thereby objectively establishing that the machine was performing within the acceptable range. *See* (RA: Defense Exhibit "K").

Opening Brief at 30.

### III.

We need not directly resolve Defendant's subsidiary arguments, summarized *supra*. We need only step back for a moment and

---

13. The January 9, 2003 letter, Exhibit 1 in evidence, from J.W. Kuahiwi Apple, State DUI coordinator, to Lawrence K. Mahuna, Chief of Police of the Hawai'i County Police Department (Chief Mahuna), reads in relevant part:

> In response to your request dated 13 December, 2003[sic], the following are in compliance with Title 11, Chapter 114 and approval is granted for their use:
> 1. Hawaii County Police Department Intoxilyzer Model 5000 Procedure for Accuracy Test dated December 3, 2002.
> 2. Hawaii County Police Department Intoxilyzer Model 5000 Operational Procedure dated December 3, 2002.

> 3. Hawaii County Police Department Intoxilyzer Model 5000 Supervisor Course Outline dated July 12, 2002.
> 4. Hawaii County Police Department Intoxilyzer Model 5000 Operator Course Outline dated July 12, 2002.
> 5. CMI Intoxilyzer Model 5000, keyboard and external printer.
> . . . .
> 8. Internal Standards Option offered by CMI, the manufacturer of the Intoxilyzer Model 5000 for use as Accuracy Verification Tests.

Exhibit H in evidence shows that Chief Mahuna's approval request letter to the DUI coordinator was dated December 13, 2002.

assume the aspect of the untutored, looking askance at what one might describe as hyperventilating over mere technicalities. After all, the DUI coordinator himself did testify time and again that he approved the 5000EN as a breath alcohol testing instrument under the DOH rules, and Defendant did not below and does not on appeal mount any real attack on the scientific reliability of the 5000EN as such.

But make no mistake, Defendant is quite serious and sincere in his arguments. What gives his arguments weight, he purports, and what is the avowed crux of his appeal, is the holding in numerous cases that there must be "strict compliance" with the DOH rules. Consult, for example, *Ige v. Admin. Dir. of the Court*, 93 Hawai'i 133, 137, 997 P.2d 59, 63 (App.2000), wherein we stated:

> In [*State v. Rolison*, 6 Haw.App. 569, 733 P.2d 326 (1987)], this court set out three foundational requirements for the admission of an Intoxilyzer test result, stating that
>
>> a proper foundation must be laid "showing that (1) the Intoxilyzer was in proper working order; (2) its operator was qualified; and (3) the test was properly administered." Also, "in meeting the foundational prerequisites for the admission of the Intoxilyzer test result there must be a showing of strict compliance with those provisions of Chapter 111 of Title 11 of the Hawaii Administrative Rules (HAR or Rules) which have a direct bearing on the validity and accuracy of the test result."
>
> *Id.* at 571, 733 P.2d at 327 (quoting *State v. Souza*, 6 Haw.App. 554, 558, 732 P.2d 253, 257 (1987)).

(Brackets omitted.)

Indubitably, it makes eminent sense to require strict compliance with the rules established by an expert agency for the operation of a technically complex and sophisticated measuring instrument, before the resulting measurement can be regarded with any degree of reliability. If you use it wrong you get it wrong, as a matter of course. And, indeed, it was the propriety of the precise procedures employed in operating the Intoxilyzer that was at issue in the cases that have articulated the "strict compliance" standard quoted above. *See, e.g., State v. Thompson*, 72 Haw. 262, 263–66, 814 P.2d 393, 394–96 (1991) (fifteen-minute observation period before Intoxilyzer test; use of operator's checklist); *State v. Ferrer*, 95 Hawai'i 409, 434–35, 23 P.3d 744, 769–70 (App.2001) (presence of a licensed supervisor during the Intoxilyzer test); *Ige*, 93 Hawai'i at 138–41, 997 P.2d at 64–67 (sufficiency of sworn statements regarding the periodic accuracy and accuracy verification testing and operation of the Intoxilyzer); *State v. Kemper*, 80 Hawai'i 102, 105–06, 905 P.2d 77, 80–81 (App. 1995) (fifteen-minute observation period before Intoxilyzer test); *State v. Matsuda*, 9 Haw.App. 291, 293–97, 836 P.2d 506, 507–09 (1992) (performance of the accuracy verification and periodic accuracy tests); *State v. Takahashi*, 7 Haw.App. 627, 629–30, 789 P.2d 1133, 1135 (1990) (fifteen-minute observation period before Intoxilyzer test); *State v. Hamasaki*, 7 Haw.App. 542, 544–45, 783 P.2d 1235, 1237–38 (1989) (known temperature of reference samples for periodic accuracy test); *Rolison*, 6 Haw.App. at 571, 733 P.2d at 327 (performance of periodic accuracy test); *Souza*, 6 Haw.App. at 560–62, 732 P.2d at 258–59 (performance of periodic accuracy test); *State v. Nakahara*, 5 Haw.App. 575, 578–80, 704 P.2d 927, 929–30 (1985) (training and permitting of Intoxilyzer operator).

But here, Defendant does not attack the testing procedures. Instead, he complains of a lack of strict compliance with the DOH rules in the mere process of approval of the breath alcohol testing instrument. He does not even attack the scientific reliability of the instrument itself. As we recognized above, the strict compliance standard carries cogent intuitive force when applied to breath alcohol testing procedures. Compelling as it is there, we simply do not feel it here. We believe a cognate distinction is in order vis-à-vis admissibility of the test results. When an expert agency approves a testing instrument and objection is made, not to the testing procedures nor even the scientific reliability of the instrument itself, but to the process of promulgating the approval, we are hard put

to see how the test results can be denigrated solely for lack of strict compliance with the agency's rules.

We have implied, if not held, that this is a distinction with a difference. In *State v. Gates*, 7 Haw.App. 440, 441, 777 P.2d 717, 718 (1989), Gates argued that the district court erred in admitting into evidence his blood alcohol concentration, obtained from a breath alcohol test on an Intoxilyzer 4011AS.

One issue we resolved was whether the Intoxilyzer 4011AS was working properly and whether the operator was qualified and administered the test properly. To these questions, we applied the strict compliance standard, stating that "there was strict compliance with the provisions of section 11–111–2.1 of the Department of Health's Rules for the Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration having a direct bearing on the validity and accuracy of the Intoxilyzer test result." *Id.* at 446, 777 P.2d at 721.

However, when it came to the issue of whether the Intoxilyzer 4011AS was a reliable measuring instrument in the first place, because it used a certain partition ratio for converting breath alcohol to blood alcohol content, we did not talk of strict compliance:

> In contending that the test result was inadmissible, Defendant essentially is attacking the Intoxilyzer's reliability as a breath-testing instrument because of the utilization of the 2,100 to 1 partition ratio. In our view, however, the Intoxilyzer's reliability has been established for the limited

foundational purpose of having its test result admitted into evidence.

Initially, we note that "[t]he technique of testing breath samples for blood alcohol content has general acceptance in the scientific community[.]" *United States v. Smith*, 776 F.2d 892, 898 (10th Cir.1985). *See also Commonwealth v. Sesler*, 358 Pa.Super. 582, 585, 518 A.2d 292, 294 (1986).

We next note that our supreme court stated that "the use of the Intoxilyzer had been approved by the Director of Health and it met the Federal Standard for Devices to Measure Breath Alcohol." *State v. Tengan*, 67 Haw. 451, 462, 691 P.2d 365, 373 (1984).[14] Recently, citing *Tengan*, the supreme court reiterated that the Intoxilyzer 4011AS was "approved for use by the county police departments[.]" *State v. Christie*, 70 Haw. 158, 163, 766 P.2d 1198, 1201 (1988), *cert. denied*, [490] U.S. [1067], 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).[15]

We held in *State v. Lowther*, 7 Haw.App. [20], 740 P.2d 1017 (1987), however, that such approval of the Department of Health does not bar a DUI defendant from more specifically challenging the Intoxilyzer's reliability by expert testimony. We stated that an Intoxilyzer test result is "not 'unassailable[,]' " *id.* at [25], 740 P.2d at 1020 (quoting *Keel v. State*, 609 P.2d 555, 557 (Alaska 1980)), and that a DUI defendant has a "constitutional right to present all relevant evidence in his defense[.]" *Id.* at [26], 740 P.2d at 1021 (quoting *State v. Vega*, 12 Ohio St.3d 185, 190, 465 N.E.2d 1303, 1308 (1984) (dissenting opinion)).

---

**14.** Resolving the defendants' primary point on appeal in *State v. Tengan*, 67 Haw. 451, 691 P.2d 365 (1984), the supreme court held that the director of health, and not the director of transportation, was the official charged with promulgating HRS ch. 91 (1993 & Supp.2005) rules for the approval of breath alcohol testing instruments. *Tengan*, 67 Haw. at 458–61, 691 P.2d at 370–72. The *Tengan* court went on to conclude that a memorandum from the director of health approving the Intoxilyzer 4011AS, *id.* at 461 n. 14, 691 P.2d at 372 n. 14, complied with department of health rules requiring that all breath alcohol testing instruments "shall be approved by the director of health[.]" *Id.* at 460 n. 11, 691 P.2d at 372 n. 11. There was no mention of "strict compliance" in the *Tengan* opinion.

**15.** On *certiorari* in *State v. Christie*, 70 Haw. 158, 766 P.2d 1198 (1988), the supreme court approved the use of a quartz crystal beam attenuator containing no alcohol as an accuracy verification device for the Intoxilyzer 4011AS, even though department of health rules specified that all accuracy verification tests must use a sample of known alcohol concentration. *Id.* at 169, 766 P.2d at 1204. There was no mention of "strict compliance" in the *Christie* court's substantive discussion, only a reference to such, without comment, in its description of our holding below, *id.* at 161, 766 P.2d at 1200, which we framed, thus: "there was strict compliance with the Rules regarding accuracy verification testing." *State v. Christie*, 7 Haw.App. 368, 376, 764 P.2d 1245, 1250 (1988).

Defendant therefore had the right through cross-examination of [police department criminalist] Hong to question the reliability of the Intoxilyzer, which utilizes a partition ratio of 2,100 to 1, and thereby to question the accuracy of the test result. However, we hold that Hong's partition ratio testimony goes to the weight the jury should accord the Intoxilyzer test result with respect to its accuracy, not to the admissibility of the test result. *See State v. Johnson*, 717 S.W.2d 298 (Tenn.Crim. App.1986) (involving an Auto–Intoximeter model AI–1000 breath-testing device which utilizes a partition ratio of 2,100 to 1). *See also People v. McDonald*, 206 Cal.App.3d 877, 254 Cal.Rptr. 384 (1988) (issue on appeal was not the admissibility of the breath test result, but the jury instruction regarding the 2,100 to 1 partition ratio); *State v. McCarty*, 434 N.W.2d 67 (S.D. 1988) (issue on appeal was the jury instructions relating to the 2,100 to 1 partition ratio, not the admissibility of the intoxilyzer test results).

*Gates*, 7 Haw.App. at 445–46, 777 P.2d at 720–21 (footnotes supplied; some brackets in the original).[16]

*Gates* dealt with the scientific reliability of the testing instrument and not with the process of its approval by the DOH. From the standpoint of materiality, however, the question of the legal standard for assessing the scientific reliability of a breath alcohol test instrument must necessarily subsume the question of the legal standard for assessing the agency process for its approval—other-

wise, the latter inquiry is just idle curiosity. Upon the example of *Gates*, we hold that the strict compliance standard does not apply to the question whether a breath alcohol testing instrument was validly approved for use under the DOH rules. "[N]or do we mean to suggest an agency is free to approve a testing instrument at its whim or fancy." *Tengan*, 67 Haw. at 459, 691 P.2d at 371.[17] We simply decide that the DUI coordinator's testimony at trial, following, was sufficient foundation to admit Defendant's breath alcohol test result into evidence.

### IV.

James Wilson Kuahiwi Apple, a chemist by training, is the State DUI coordinator for the DOH under Title 11, Chapter 114 of the HAR, which he authored. The DUI coordinator testified on direct examination that the Intoxilyzer Model 5000EN is

actually the Intoxilyzer Model Number 5000. The EN just refers to its most recent series or iteration.

. . . .

Had to do with differentiating between models.

. . . .

And, um, minor changes that a manufacturer may incorporate into later versions of the model. And therefore, it's the Intoxilyzer Model Number 5000 that's approved in its various iterations. It's a number of them starting with the 64 series. There's a 66 series, there's [a] 68

---

**16.** *See also State v. Rolison*, 6 Haw.App. 569, 733 P.2d 326 (1987), where we held that the breath alcohol test result from an Intoxilyzer 4011AS was erroneously admitted into evidence because there was not evidence of strict compliance with the department of health rules regarding periodic accuracy tests. *Id.* at 571, 733 P.2d at 327. The State asserted, however, that the instrument was "fail-safe" because the operating police officer testified that the instrument's error light did not go on and the instrument printed a result, neither of which would be the case if the instrument was not working properly. In response to this assertion, we stated that, where no expert witness testifies to the reliability and infallibility of the instrument, we

are not persuaded that the Intoxilyzer is "fail-safe" in all respects, including its accuracy regarding the test result. We defer to the

legislature's appointed expert, the Department of Health, to determine whether the Intoxilyzer is totally "fail-safe." Until such determination is made, the State must strictly comply with [department of health rules] regarding testing for accuracy to meet the foundational prerequisites.

*Id.* at 573–74, 733 P.2d at 329.

**17.** *See* HAR § 11–114–2 (eff. Dec. 30, 1993):

§ 11–114–2. *Compliance.* Nothing in this chapter shall be construed as limiting the introduction in any legal proceeding of relevant evidence of the alcohol concentration of a person's blood, breath, or other bodily substance not obtained in strict compliance with the requirements of this chapter provided that the evidence is offered in compliance with the Hawaii rules of evidence.

series, a 68 EN series. All of these are Intoxilyzer Model Number 5000s and are approved under the federal register and by myself.

. . . .

Again I differentiate between model and series. The Intoxilyzer Model Number 5000 in general can be described scientifically as an optical bench and then the electronics that interpret the information from the optical bench.

. . . .

Yes. The optical bench is the actual part of the instrument that does the real analysis for alcohol in breath. And so when we talk about the optical bench we're talking about a light bulb, a chamber that the breath is contained within, a filter wheel, and a detector. And all of the Intoxilyzer Model Number 5000s have very similar optical benches. In other words, the analytical part of the instrument is essentially the same.

With the electronics that occur after that, they're merely a way of looking at the voltages generated by the detector. And working with those voltages to generate a[sic] alcohol concentration.

. . . .

Certainly. It would be difficult to—from an optical bench standpoint, which again is that analytical part of the instrument that's really looking for the alcohol—it would be difficult to differentiate the EN from all the rest of the 5000 series instruments.

. . . .

Well there are differences within the different series of Intozilyzer Model Number 5000. The 64, 66, and 68, 68 ENs. And even within those there are—each one of those there were minor changes of boards and components and that sort of thing. So throughout the life of the Intoxilyzer 5000 there have been a progression of small changes to the instrument. So one would have to say that there are real differences among them, but from a factory standpoint, from my standpoint as the evaluator of the instruments for the State, I have to say that when I look at the Intoxilyzer 5000 I'm looking at an instrument that particularly from an analytical standpoint really is the essentially the same instrument from it earliest iterations, the 64 series all the way up to today.

. . . .

Well I think it would be more specific. I'd say it's got the same engine year to year. The other peripheral external things like printers, keyboards, communications, capabilities, oh, battery back-up, RAM boards, things like that, really are just nice-ities[sic] but don't—have not really made a real change to the instrument itself. So the heart of the instrument, the real part that does the analysis of alcohol, has remained consistent.

Q. Has the Intoxilyzer Model 5000 EN manufactured by CMI, Inc., been approved by you as the State DUI Coordinator for testing of blood alcohol level for DUI cases?

A. Yes, it has.

Q. Okay. When did that occur?

A. December 1992, I believe. But I've got the approval letters if—I'm sorry, my approval letter is dated 9, January 2003. It's the most recent approval letter to the City and County of—or the County of Honolulu—I'm sorry, the County of Hawaii.

. . . .

Q. Did you determine that the model 5000 EN was in compliance with Title 11, Chapter 14[sic] of the Hawaii Administrative Rules?

A. Yes, sir. It is.

Q. And is that also contained in that January 9th, 2003, letter?

A. That it is an approved instrument—

Q. Yes.

A. —in accordance with Title 11, Chapter 14[sic], yes.

. . . .

. . . Q. How important is that optical bench in relation to the entire Intoxilyzer 5000?

A. Without it one does not get an alcohol concentration. And, in fact, with it exclusively one can get an alcohol concentration. In other words, I have taken the

voltages directly from the detector, bypassed all of the subsequent circuitry, and have calculated very accurate alcohol concentrations without any of the rest of the instrument.

Q. I note in what's been introduced as State's Exhibit 1 that you referenced Intoxilyzer Model 5000. Do the contents of that letter to Chief Mahuna apply equally to the Intoxilyzer Model 5000 EN?

A. Well they apply specifically to the Intoxilyzer Model Number 5000 which includes the EN series. More specifically, I worked very closely with the traffic unit, in formulating their protocol for use of the Intoxilyzer 5000, in this case EN series, operator protocol and supervisor protocol.

On cross-examination, the DUI coordinator explained the different accuracy verification tests employed by the Intoxilyzer 5000 and the Intoxilyzer 5000EN, respectively:

Q. Let me ask you about the operation of the Intoxilyzer 5000 EN and the differences between that and the operation of the Intoxilyzer 5000 before the EN iteration came into use. The Intoxilyzer series 5000, not EN okay, as used in the County of Hawaii involved an accuracy verification test, which was performed as part of each testing procedure; would you agree with that?

A. Yes, I would.

Q. It involved the officer testing or running through the machine a known sample or a sample of known concentration; correct?

A. That's correct. Alcohol vapor concentrate, yeah.

Q. And the machine would then test that known sample, print out a test result, and the operator could compare it with the known concentration; correct?

A. That's correct.

Q. One means of telling whether the machine at that moment in time appeared to be working accurately; correct?

A. That's correct.

Q. It's why they call it an accuracy verification test; correct?

A. That is one of the approved accuracy verification tests.

Q. The State of Hawaii regulations in fact require that any approved machine also be capable of performing an approved accuracy verification test; correct?

A. That's correct. With each breath test.

. . . .

... Q. Section—Title 11–114–6, which is titled or subtitled Procedure Approvals and Measurement Requirements, states in subsection (b)(5) that:

"The result of the accuracy verification test shall be within the range of plus or minus point zero one, or plus or minus ten percent of the target value, whichever is greater."

Correct?

A. Yes, sir. It does that.

Q. And that in fact is the required— the current existing requirement for accuracy verification test; correct?

A. Any instrument to be used for alcohol testing in the State of Hawaii for DUIs must meet that minimum criteria[sic].

Q. The Intoxilyzer 5000—not EN, but the iteration in use before the EN came out—on the printed test results included a printed read-out of the accuracy verification reading; correct?

. . . .

A. For the County of Hawaii it included a[sic] accuracy verification test result.

Q. That is the read-out that was resulted when the person operating the machine ran the known sample through it as part of the test procedure?

A. That's correct.

Q. It's printed right on the ticket or the whatever you call the—

A. The printout.

. . . .

Q. Mr. Apple, are you generally familiar with the printout which is printed when a person is tested or when a test process is conducted using the machine which is labeled 5000EN?

A. Yes, sir, I am.

. . . .

Q. Okay. Now on the printout there is a section of the printout which lists certain test readings which are taken as the machine and the operator go through the testing process; correct?

A. Yes, sir.

Q. They represent portions of the procedure where the test is of a blank cylinder or a blank cell; correct? Empty?

A. The air blank, yes, sir.

Q. That's to find out, is it clean and unpolluted when the process begins?

A. Yes, sir.

Q. There is a section where on this printout a reading for what is called internal standard is printed; correct?

A. Yes.

Q. And it says "internal STD"—which I take it is shorthand for standard—"passed"?

A. Yes, sir.

. . . .

Q. After the internal standard, there is another air blank; correct?

A. Yes, sir.

. . . .

. . . Q. Then there is a section for subject?

A. Yes, sir.

Q. That is the purported reading of the breath which was produced by the person who's being tested; correct?

A. That's correct.

Q. And then finally there's another air blank to show that the thing was cleared when the test procedure was completed; correct?

A. Yes, sir.

. . . .

Q. Regulations require that in each test procedure performed on a citizen who's being investigated for a potential alcohol related criminal offense or civil offense, that there be an accuracy verification test as part of the individual's test procedure; correct?

A. With each breath test, yes, sir.

Q. Right. And that requirement is satisfied apparently in this particular case by what is listed as the internal standard?

A. Yes, sir.

Q. Can you tell us briefly what exactly is or does the internal standard that's on this document represent?

A. It represents an electronic simulation of an alcohol concentration in its briefest form.

Q. Okay. When you say an "electronic simulation" does the machine itself perform the simulation?

A. All of it is integral to the instrument, yes, sir.

Q. Okay. By that—another way of asking that question is, the machine is not exposed to some external sample of a known alcohol concentration and tested against that sample; correct?

A. Not with an internal standard, sir. No.

Q. It is purely an electronic process which is built into the—the functioning of the machine? I mean—

A. It would be difficult to say purely electronic because it also evaluates the optical bench. But it is certainly electronic.

. . . .

Q. The machine in effect tests itself?

A. Yes, sir.

Q. Okay. Now this machine—the machine that produced this printout is fully capable of being tested for accuracy by means of the introduction of known—samples of known concentration and literally running a test against that known concentration and seeing if the readout is as it should be; correct?

A. Yes, sir. Sure is.

Q. In fact that process is, as you understand it, what is done on a monthly basis by the Intoxilyzer supervisor who is charged with the responsibility of conducting such a test no less than every 30 days for every machine; correct?

A. Well every 31 days. . . .

. . . .

Q. Okay. But the rules do say that if it is too far off the target value, the machine

must immediately be taken out of service until the problem is corrected; correct?

A. That's correct, sir. Yes.

. . . .

[Q.] Mr. Apple, I'd like to show you what has been marked as Defendant's Exhibit K. And first, do you recognize it at least as being typical of a printout for an intoxilyzer unit which was previously in service and is described on it as model 5000?

. . . .

A. Yes, sir. Particularly for this County.

. . . .

Q. Okay. And the result for the calibration check in this printout is actually a numerical value; correct?

A. Yes, sir.

Q. In this particular case it was point one zero four; correct?

A. That's correct.

Q. And at least on the face of it we would assume that the sample which was tested was of a known concentration of point one zero zero; correct?

A. In fact, there was enough identifying information on that printout for me to identify the maker of the solution, and its lot number, and presumably it is a point one zero zero.

. . . .

Q. The regulations require that the accuracy verification test produce a result which is within ten percent or less of the target value; correct?

A. That's—well ten percent or point zero one whichever is—

Q. Whichever is—

A. —greater.

Q. —greater. Insofar as State's Exhibit J is concerned, that is the printout that we had for Mr. Rabusitz, nothing on the face of that document tells us either what the target value was involved in the internal standard check or the degree to which the machine matched or hit that target value; correct?

A. There—by that do you mean numerical value? There is no numerical value shown.

Q. On this printout?

A. For the—for the accuracy verification test. No, sir.

Q. One cannot look at this document and ascertain whether the accuracy verification test produced a result that was either within point zero one or ten percent of the target value; correct?

A. Actually that would be incorrect; sir.

Q. Why would it be incorrect?

A. Your question was, I believe earlier, whether there was a numerical result. And there is no numerical result printed. But the internal standards in the many, many times that they are checked at, in fact five different concentration levels, each time must—for every one of those tests, must be within five percent or the instrument will fail.

Q. That's something which is done at some time other than the moment before Mr. Rabusitz was tested?

A. It can occur—it must occur with each breath test, it can occur before or after a breath test.

On redirect examination, the DUI coordinator clarified the approval process vis-á-vis variants of the Intoxilyzer 5000:

Q. One second. And so between the 66 series and the 68EN series, were there any fundamental changes to the optical bench?

A. Fundamental? No fundamental changes. There were some minor changes that allowed alcohol concentrations at very low levels to be measured more accurately.

Q. And in your opinion did those changes require you to re-approve the machine?

A. No, sir.

. . . .

Q. And why not?

A. Ah, because the real analytical part of the instrument continued to perform essentially identically to the earlier series of intoxilyzer.

Q. And as we stand here today right now, do you have any hesitation in saying that you currently approve the 68EN series to perform breath alcohol testing in the County of Hawaii?

A. No. No hesitation at all, sir.

Q. And [defense counsel] went over with you at length a number of different exhibits from a presentation that I think that you had done that's categorized different changes that were made to the—says changes to the 5000EN series. I think was—the title was, How is the 5000EN different. You remember looking at those with [defense counsel]?

A. Yes, sir, I do.

Q. And any single—to the best of your knowledge from looking at those documents, did any one of those changes that are listed on any one of those pieces of paper, were they a significant enough change so that you thought that you had to recertify the 5000?

A. No, sir. None of those were a real concern to me.

Q. And why not?

A. They may be helpful. Ah, because, again analytically, the way the instrument measures alcohol concentration remained fundamentally unchanged.

. . . .

Q. Okay. I don't know if I'm going to get this verbatim. Was something to the effect of as the author or Title 11, Chapter 114, when you use the word modification—I think the phrase is, "The DUI coordinator may approve in writing modified versions of approved instruments."

Did you consider the change from the 66 to the 68EN series to be a modification that required your subsequent re-approval?

A. No, sir. I did not.

. . . .

A. Modifications to me—and first of all it said that I may approve in writing. I looked at modifications as some fundamental change to the way the instrument worked analytically that would cause me as a scientist to need to re-evaluate the workings of the instrument and make a deter-

mination as to whether that instrument is still going to give accurate reliable alcohol testing results.

V.

We conclude, finally, that in admitting Defendant's breath alcohol test result into evidence, the district court did not abuse its discretion. *See Thompson,* 72 Haw. at 265, 814 P.2d at 395 ("the ultimate question is whether the trial court abused its discretion in admitting the [Intoxilyzer] test result into evidence" (citation omitted)). Accordingly, the two April 5, 2004 judgments of the district court are affirmed.

